898 F.2d 512
 ALLEN & O'HARA, INC., a corporation, Plaintiff-Appellant,
Cross-Appellee,
and
Maryland Casualty Company, a corporation, Intervening
Plaintiff, Defendant on Counterclaims, Cross-Appellee,
and
The Northwestern Mutual Life Insurance Company, a
corporation, Intervening Plaintiff, Defendant on
Counterclaims and Third-Party
Plaintiff-Appellant, Cross-Appellee,
v.
BARRETT WRECKING, INC., a corporation and Thomas M. Barrett,
Defendants-Appellees, Cross-Appellants.
 Nos. 88-2509, 88-2558 and 88-2559.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 3, 1989.
Decided Feb. 13, 1990.
As Amended Feb. 15, 1990.
Rehearing Denied March 15, 1990.
 
 Before BAUER, Chief Judge, FLAUM and KANNE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 This diversity case concerns a contract between Allen & O'Hara (A & O) and Barrett Wrecking (Barrett) for the demolition of a building owned by Northwestern Mutual Life Insurance (NML). After a six week trial, the jury issued a special verdict finding that A & O had wrongfully terminated the contract and that NML had tortiously interfered with the contract. The district court granted NML judgment n.o.v. on the tort claim. The principal issue in this case involves the proper measure for contract damages under Wisconsin law. In addition, the parties appeal the district court decisions regarding tortious interference with contract, statutory conspiracy, punitive damages, payment of costs, attorney's fees, and prejudgment interest for both contract damages and conversion damages. For the reasons stated below, we affirm except with respect to the prejudgment interest on the contract damages.
 
 Facts and Proceedings Below
 
 2
 NML hired A & O, a wholly owned subsidiary of NML, to act as its general contractor for the renovation of NML's downtown Milwaukee office. As part of the renovation, A & O solicited bids for the demolition of part of the office, giving tours of the building and allowing potential bidders to examine the building's blue-prints. Barrett submitted a bid of $595,000, slightly below its anticipated cost of demolition on the basis that it could cover its costs through sale of the salvage. Barrett's bid was significantly below other bids, so A & O and Barrett entered into a demolition contract.[1]
 
 
 3
 The contract called for demolition work to begin in May of 1979 and to finish in September 1979. NML did not, however, vacate the building until mid-to-late August and full scale demolition did not begin until August 27, 1979, at which time Barrett submitted a four month completion schedule.
 
 
 4
 Almost immediately upon commencement of the demolition, Barrett began to encounter unanticipated conditions which caused delays. These conditions included a vault that was constructed of steel, concrete and copper, and heavy structural beams designed to support eight additional stories. Complaints regarding excessive dust, noise, and vibrations caused A & O to instruct Barrett to employ procedures to reduce these conditions which slowed the demolition process further.
 
 
 5
 The delays pushed the completion date further and further back, until Barrett finally submitted a schedule that called for completion in July 1980. Eventually, Francis Ferguson, President of NML, expressed his concern over the delays to A & O, and on May 9, 1980, A & O terminated the contract.
 
 
 6
 A & O promptly sued Barrett and State Surety (Barrett's bonding company) for breach of contract. It also named, in his individual capacity, Thomas Barrett, president of Barrett Wrecking, as a defendant. Barrett counterclaimed for breach of contract. Their dispute centers around which party was responsible for the delays and who should bear the additional costs of demolition caused by the delays and the subsequent changes in procedure. The contract was a fixed-price contract and called for formal written change orders for any change in price. Even so, Barrett claims that it is entitled to payment for extra costs because the parties waived the contract provisions calling for written change orders.
 
 
 7
 NML intervened as of right in the action because it was potentially liable as an indemnitor of A & O. Barrett counterclaimed against NML for tortious interference with business contract relationships, and (along with Thomas Barrett) common law and statutory conspiracy to damage reputation, trade and business.
 
 
 8
 The district judge dismissed the common law conspiracy claims on a motion for partial summary judgment. Following a six week trial, the jury returned a special verdict finding that A & O had breached the contract by terminating it without justification. They awarded compensatory damages of $852,000. They further found that A & O had wrongfully retained salvage belonging to Barrett in the amount of $62,798. In addition, the jury found that NML had wrongfully interfered with the contractual relationship between Barrett and A & O, with damages of $1,400,000.
 
 
 9
 The district judge granted judgment n.o.v. on the tortious interference claim, finding that NML was privileged to interfere with the contract and therefore the claim failed as a matter of law. He also denied motions by Barrett for prejudgment interest and for State Surety's attorney's fees.
 
 Analysis
 1. Preliminary Matters
 
 10
 Before considering the proper measure of damages, we dispose of Barrett's counterclaims. Except for the claim for prejudgment interest on the contract damages, none of these claims has merit and we affirm the district court.
 
 
 11
 Barrett's first claim is that the judge should not have granted a directed verdict to the plaintiffs but should have submitted its conspiracy claim to the jury. We review this decision de novo. Selle v. Gibb, 741 F.2d 896 (7th Cir.1984).
 
 
 12
 Initially, we note that district courts, in general, should be reluctant to remove an issue from the jury. Nevertheless, where there is not substantial evidence to support the verdict, a directed verdict or, alternatively, a judgment n.o.v. is appropriate. See id. at 900; Erwin v. County of Manitowoc, 872 F.2d 1292, 1295 (7th Cir.1989); Brady v. Southern Railway, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943). "All the evidence, taken as a whole, must be viewed in the light most favorable to the non-moving party. This evidence must provide a sufficient basis from which the jury could have reasonably reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts." Selle, 741 F.2d at 900. A judgment n.o.v. is appropriate only if this is not the case.
 
 
 13
 Barrett's conspiracy claim is based on a civil cause of action deriving from a criminal conspiracy statute. Wis.Stat. Sec. 134.01; Radue v. Dill, 74 Wis.2d 239, 246 N.W.2d 507, 511 (1976). To establish this claim, Barrett needed to prove that NML conspired or acted in concert with at least one other individual or entity to willfully injure Barrett (or Thomas Barrett) in their reputations or businesses and that injury resulted. Id.
 
 
 14
 Barrett's proof relies entirely on circumstantial evidence which is sufficient to prove a claim of conspiracy, Lange v. Heckel, 171 Wis. 59, 175 N.W. 788, 789-90 (1920), but it is necessarily weaker than direct evidence. In Wisconsin, if circumstantial evidence supports equal inferences of lawful action and unlawful action, then the claim of conspiracy is not proven. See Scheit v. Duffy, 248 Wis. 174, 176, 21 N.W.2d 257 (1946). We believe that at best this is the case here.
 
 
 15
 Barrett's claim relies on essentially one piece of evidence: the termination of Barrett from two independent demolition contracts (the A & O contract, and a contract with Milwaukee) at about the same time. Barrett claims that this unusual circumstance warrants an inference of concerted action. This evidence alone, however, is not sufficient to show that the conspirators acted with the specific, malicious purpose of injuring the plaintiff. See Radue, 74 Wis.2d at 246, 246 N.W.2d 507. The demolition contract with Milwaukee was behind schedule and the evidence shows that Milwaukee had independent reasons for terminating its contract with Barrett. And even if Milwaukee acted maliciously, no evidence was offered to support a finding of malevolence by NML. We find, in agreement with the district court, that the evidence of a conspiracy fails as a matter of law.[2]
 
 
 16
 Barrett's next claim is that the district judge erred in granting judgment n.o.v. on the claim that NML tortiously interfered with the demolition contract between A & O and Barrett. Wisconsin recognizes a cause of action against one who, without privilege to do so, induces a third person not to perform a contract with another. Harman v. LaCrosse Tribune, 117 Wis.2d 448, 344 N.W.2d 536 (Ct.App.1984). The Wisconsin courts have adopted the Restatement (Second) of Torts on tortious interference with contracts. Liebe v. City Finance Company, 98 Wis.2d 10, 15-16, 295 N.W.2d 16 (Ct.App.1980); Restatement (Second) of Torts Secs. 766, 767 (1979). Section 769 of the Restatement discusses the situation where the actor has a financial interest in the business of the person induced. This section states that there is no tortious interference when one who has a financial interest in the business of a third party causes that person not to enter into a contract so long as wrongful means are not employed and the actor is protecting his interest in the relationship with the third party. Id. Sec. 769.
 
 
 17
 We believe that section 769 governs here. Comment c of that section states that a part owner of a business has a financial interest in the business. Therefore, NML had a financial interest in A & O. Moreover, comment e states that if the action is directed toward protecting the actor's interest, it is immaterial that he also takes a "malicious delight" in the harm caused by his action. While Barrett argues that NML had a malicious purpose, it is clear that NML also acted to protect what it felt was its interest in the demolition. Finally, there is no evidence that NML used wrongful means. In Pure Milk Products Coop v. National Farmers Organization, 64 Wis.2d 241, 219 N.W.2d 564 (1974), the Wisconsin Supreme Court listed coercion by physical force or fraudulent misrepresentation as examples of improper means. There is no evidence that any means resembling physical force or misrepresentation were used by NML. Consequently, Barrett's claim of tortious interference fails as a matter of law.[3]
 
 
 18
 Barrett also seeks reimbursement for State Surety's attorney's fees which Barrett had to pay subject to an indemnification agreement. This element of damages was not pled. Rather it was raised only in post-trial motions. A & O and NML might have avoided these costs had they been forewarned of this exposure, i.e., they might have settled with State Surety or made a record regarding duplication of efforts between counsel for State Surety and counsel for Barrett. On this basis, the district court ruled that it would be inequitable to amend the pleadings at this last stage and we agree.
 
 
 19
 Barrett also argues that it is entitled to prejudgment interest on the contract damages and on the conversion or salvage damages. The contract itself grants interest on payments due and unpaid under the contract. The district court, however, held that Wisconsin law was determinative because of a clause in the contract stating that "[the] contract shall be governed by the law of the place where the Project is located." The district court held that this clause required it to look at Wisconsin law on prejudgment interest. State common law, however, normally governs a contract only insofar as there are gaps in the contractual language. Where the contract is clear, there is no need to examine the underlying state law. The contract in this case indicates that interest shall be due on all unpaid amounts under the contract. As such, Barrett is entitled to prejudgment interest on the contract damages and we remand for a finding on the amount of such interest.
 
 
 20
 Prejudgment interest on the salvage is not governed by the contract, so the district court properly turned to Wisconsin law. Wisconsin case law holds that interest can ordinarily be recovered if the amount claimed and recovered was readily determinable prior to trial. Moutsopoulos v. Amer. Mut. Ins. Co., 607 F.2d 1185, 1190 (7th Cir.1979) (applying Wisconsin law). A genuine dispute as to the amount due will defeat the claim for interest because the defendants cannot reasonably determine the amount due and tender it. Id. Barrett sought over $280,000 for the lost salvage but was awarded only $62,798. Consequently, there was a genuine dispute as to the amount that was due, and therefore, the district court correctly held that the judgment was not readily determinable prior to trial and denied prejudgment interest on the salvage.
 
 
 21
 Finally, Barrett contends that the district judge abused his discretion in not issuing a written explanation of his denial of costs pursuant to Fed.R.Civ.Proc. 54(d). Rule 54(d) states that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Our standard on review is abuse of discretion. Hudson v. Nabisco Brands, Inc., 758 F.2d 1237, 1242 (7th Cir.1985). Both Barrett and A & O prevailed in part, and therefore we cannot say that the district court abused its discretion. A written opinion is helpful for the reviewing court, but here the district court was clearly within its discretion.
 
 
 22
 To summarize our holdings on this covey of claims, we affirm the district court on all claims except for prejudgment interest on the contract damages. We remand for a finding on the extent of this interest.
 
 2. Contract Damages
 
 23
 The remaining issue concerns the proper measure of contract damages. A & O advances several contentions with respect to damages. First, they argue that Barrett offered no proof of lost profits, that is, the benefit of the bargain had the contract been fully performed less the expenses saved by nonperformance. In fact, they argue that the contract was a losing proposition for Barrett and he should have been glad to be relieved of its burden: it would have cost Barrett more to complete the job than was due as payment. In addition, A & O argues that the jury was exposed to "total-cost-theory" evidence which is not recognized by Wisconsin. Fattore Co. v. Metropolitan Sewerage Commission, 505 F.2d 1, 5-6 (7th Cir.1974). They argue that because "total cost" is not a theory of contract damages recognized under Wisconsin law or by the contract, introduction of this evidence resulted in the incorrect measure of damages by the jury.
 
 
 24
 To counter these arguments, Barrett offers a contract modification theory. Under this theory, they argue that the written modification provision of the contract was waived by A & O. Based on this waiver, Barrett asserts that it is entitled to payment for a number of "extras," the sum of which almost equals the damages awarded by the jury. If Barrett's contract modification theory is correct, then A & O's position that the written contract was not profitable is not tenable: the contract price would have been modified and Barrett would be entitled to damages under the modified contract.
 
 
 25
 It is clear under Wisconsin law that a written contract may be subsequently modified orally by the parties. S & M Rotogravure Serv. Inc. v. Baer, 77 Wis.2d 454, 252 N.W.2d 913, 919 (1977); Wiggins Constr. Co. v. Joint School Dist., 35 Wis.2d 632, 638, 151 N.W.2d 642 (1967). The Wisconsin Supreme Court has "recognized that a provision in construction contracts requiring written change orders may be avoided where the parties evidence by their words or conduct an intent to waive or modify such a provision." Rotogravure, 252 N.W.2d at 919. Waiver involves an inquiry into the intent of the parties, and is properly an issue for the jury. We divide this issue into two parts: whether there was sufficient evidence for the jury to conclude that the written modification provisions were waived and whether an agreement to modify the contract for each individual "extra" was supported by sufficient evidence.
 
 
 26
 A & O argues that there was no waiver of the written modification provisions of the contract. To support their claim, they contend that the written modification provisions had been followed early in the contract and that just prior to the termination of the contract, negotiations to formally modify the contract had gone as far as drafting of the modification provisions. They maintain that because the parties followed the written modification provisions at these times, there was no waiver of the provision requiring written modification.
 
 
 27
 Barrett, on the other hand, submits as evidence the testimony of Ron Retzer, a principal of Barrett, stating that an informal arrangement had been reached between A & O and Barrett. The substance of this arrangement was that Barrett would perform changes in the work as requested by A & O without a written change order and would be compensated when the demolition was completed. Presumably, the purpose behind such an arrangement was to allow the parties to work out their differences without the formality and expense of written change orders.
 
 
 28
 This evidence was submitted to the jury with instructions that a waiver must be a voluntary, knowing choice to forego something of value. Neither party objects to this instruction. Based on this evidence, the jury apparently believed the testimony of Ron Retzer. The district court, when considering the motion for judgment n.o.v. also found his testimony credible. We decline to disturb a finding of fact supported by evidence, found credible by both the district court and the jury, and therefore hold that the finding of the waiver of the written modification provisions was supported by the evidence.
 
 
 29
 The final issue before us is whether the various "extras" claimed by Barrett were each supported by sufficient evidence for the jury to grant damages. As a preliminary matter, we note that while the jury returned a special verdict, it did not separate the elements of the contract award; rather is simply awarded damages that reasonably flowed from A & O's wrongful termination. It is difficult, therefore, for us to determine which of the "extras" the jury found to be supported by the evidence. We believe, however, that there was sufficient evidence to support each of the various "extras" claimed by Barrett.
 
 
 30
 Barrett claimed that it was due payment on eleven different "extras." The total cost of these "extras" was $556,953. In addition, Barrett claims another $147,593 for overhead and profit on the "extras," which, if the "extras" are supported by the evidence, flow from these "extras." The two major items are a change in technique ($216,608) and removal of a vault ($148,400). The change in technique was ordered by A & O after they found that the original method contemplated by Barrett caused too much noise and dust. Consequently, the jury was entitled to believe that the contract was modified in this respect. With respect to the vault, the bid package given to Barrett only showed an area for a future vault and contained no plans at all showing the composition of the vault. When Barrett began to dismantle the vault, it discovered that the vault was virtually impervious to the wrecking ball and had to be dismantled piece by piece at considerable time and cost. The jury apparently relied on the testimony of Ron Retzer that A & O agreed to the unexpected extra costs for dismantling the vault and the district court found his testimony credible. We, therefore, believe that the jury had sufficient evidence to find A & O liable for the cost of dismantling the vault. The other, smaller "extras" are all supported by similar evidence. The testimony of Ron Retzer, who was subject to days of cross-examination, appears to have been the primary source relied on by the jury for calculating damages and given this testimony, we decline to overturn the jury verdict. We agree with the district court that "the verdict was not against the weight of the evidence; the damages, although generous, are not excessive...."
 
 
 31
 Finally, regarding the introduction of total cost evidence, apparently, this evidence was little more than the sum of the "extras," each of which we have found supported by evidence sufficient to support the jury. Therefore, the introduction of this evidence cannot be said to have prejudiced the jury.
 
 
 32
 The judgment of the district court is affirmed in part, remanded in part.
 
 
 
 [1]
 The contract was actually split into two contracts each for half the work, apparently for bonding purposes. The two contracts are identical and we will simply refer to them collectively as the contract
 
 
 [2]
 Barrett also argues that its bank's discontinuation of its line of credit, a memorandum between an attorney for the City of Milwaukee and an attorney for A & O concerning Barrett, and the institution of this lawsuit support the theory of conspiracy. All of this evidence, while potentially helpful to their claim, is more easily explained by innocent occurrences than by a malicious conspiracy. This evidence, even in concert with the evidence of simultaneous termination, does not provide sufficient support for Barrett's claim
 
 
 [3]
 Since neither of Barrett's tort claims have merit, Barrett's claim of punitive damages must also fail