IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 98-50559

KAEPA, INC.,

Plaintiff-Appellant-Cross-Appellee,

versus

ACHILLES CORPORATION,

Defendant-Appellee-Cross-Appellant.

Appeal from the United States District Court
for the Western District of Texas, San Antonio

May 17, 2000

Before POLITZ, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:[*]

Plaintiff-appellant-cross-appellee Kaepa, Inc. (Kaepa), a United States shoe manufacturer, brought this action against its Japanese shoe distributor, defendant-appellee-cross-appellant Achilles Corporation (Achilles), alleging, *inter alia*, breach of the parties' distributorship agreement–executed April 30, 1993 to be effective June 1, 1993--and fraudulent inducement by Achilles to enter into the agreement. In response, Achilles filed several counterclaims, including breach of

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

contract and fraud. After the parties presented their evidence, the district court entered judgment as a matter of law against Kaepa on its fraudulent inducement claim. The jury then found that Achilles had breached its distributorship agreement with Kaepa, but that Kaepa had waived any breach. Based on the verdict, the district court entered a take-nothing judgment and ordered each party to bear its own costs. Kaepa moved for a new trial on the ground that the jury's finding of waiver was against the great weight of the evidence and that the evidence was legally insufficient to constitute waiver. The district court denied this motion. Kaepa now appeals the district court's grant of judgment as a matter of law on its fraudulent inducement claim, as well as the denial of its motion for a new trial based on the jury's waiver finding. Achilles appeals the district court's denial of its motion for costs. We affirm.

**Discussion**

I. Kaepa's Fraudulent Inducement Claim

Kaepa argues that the district court erred in entering judgment as a matter of law in favor of Achilles on Kaepa's fraudulent inducement claim. At trial, Kaepa's theory in support of this claim had been that Achilles fraudulently induced it to enter into the distributorship agreement by promising to market Kaepa shoes in Japan as a full-line product, including men's and women's shoes, all the while secretly intending to position Kaepa as only a women's "niche" product. Having reviewed the record and briefs, we conclude that the district court did

2

not err in granting judgment as a matter of law on this claim.

We review the grant of judgment as a matter of law *de novo*. *See Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1042 (5th Cir. 1998). Under *Boeing Co v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*), judgment as a matter of law is appropriate "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Boeing*, 411 F.2d at 374. "There must be a conflict in substantial evidence to create a jury question." *Id.* at 375. In considering the grant of judgment as a matter of law, we will view all evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Id.* at 374.

The elements of fraudulent inducement under Texas law (which the parties and the district court have treated as controlling) are: (1) a material representation was made; (2) the representation was false when made; (3) the speaker knew it was false, or made it recklessly without knowledge of its truth and as a positive assertion; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the misrepresentation caused injury. *See Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). "A promise to do an act in the future is actionable fraud when made with the intention, design, and purpose of deceiving, and with no intention of performing the act." *Spoljaric v. Percival*

3

*Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). In order to survive Achilles's motion, Kaepa had to present evidence that Achilles made representations with the intent to deceive and with no intention of performing. *Formosa*, 960 S.W.2d at 48. Moreover, the evidence presented had to be relevant to Achilles's intent at the time the representations were made. *Id.* The element of intent is crucial in distinguishing fraudulent inducement cases "from situations in which a party has made a promise with an existent intent to fulfil its terms and who then changes his mind and refuses to perform; otherwise, every breach of contract would involve fraud." *Oliver v. Rogers*, 976 S.W.2d 792, 804 (Tex. App.–Houston [1st Dist.] 1998, pet. denied).

The evidence that Kaepa relies on to show that Achilles never intended to market its shoes as a full line but instead only as a women's niche dissipates in light of the fact that from the beginning Kaepa knew very well what Achilles was doing. In fact, Kaepa was affirmatively in favor of focusing its marketing efforts in Japan primarily, though not exclusively, on its "niche" products–cheerleading, volleyball, and tennis–which were largely women's shoes. Kaepa hoped this strategy would enable it to establish a new foundation in Japan for its flagging product line and position it for an eventual expansion as a significant player in all areas of the Japanese athletic shoe market. According to Kaepa, the following items, individually and collectively, at least

4

create a jury issue about whether Achilles ever intended to keep its promises that it would not limit Kaepa to being a "niche" product in Japan; we will address them *seriatim*.

1.  The February 16, 1993 meeting between Kaepa and Achilles officials at Achilles's offices in Tokyo. During the meeting, Achilles Senior Manager Takeshi Yagi (Yagi) drew several diagrams to illustrate Achilles's vision for its marketing and distribution of Kaepa shoes in Japan. In one of these diagrams, Yagi depicted Kaepa as Achilles's women's brand and Spalding as its men's brand. Kaepa President Frank Legacki (Legacki) objected to this characterization because Kaepa intended to be a full-line product in Japan, not merely a niche product. Yagi corrected the diagram accordingly. Without more, this episode evidences merely a preliminary negotiation and does not demonstrate an intent by Achilles to undercut Kaepa's plan for the Japanese athletic shoe market.

2.  The March 16, 1993 letter from Legacki to Achilles President Sadao Nakagima (Nakagima), in which Legacki expressed concern about Yagi's initial diagram and the possibility that Achilles would position Kaepa as its "female" brand. Legacki stated that it was Kaepa's intent to become "a large, dominant top-quality, performance brand" and that the only way for Kaepa "to develop to its full potential" was to remain flexible to enter all segments of the athletic shoe market, including men's shoes. On

March 17, 1993, Nakagima wrote back and assured Legacki that Achilles would be "more than happy to cooperate" with Kaepa's vision for its product line "if Kaepa will be strongly developing [sic] in the [men's] basketball and cross training field."

What Kaepa fails to note is that in correspondence a week earlier, Legacki outlined for Nakagima his vision for Kaepa's strategy in Japan that was explicitly premised on a primary emphasis on the women's brand niche products. Kaepa had been declining as a brand in Japan before it entered the distributorship agreement with Achilles. In its relationship with its former distributor, Diawa Corporation (Diawa), Kaepa had gone from a peak of 1.2 million shoes sold to Diawa in 1988 to 566,000 pairs in 1992, and in the first three months of 1993, orders were down an additional seventy percent. On March 8, 1993, Legacki wrote to Nakagima and told him that Kaepa needed to enter a "transition period" during which its Japanese strategy would "coordinate more closely" with its strategy in the United States. In the United States, Kaepa had aimed at a stable market niche of cheerleading, tennis, volleyball, and aerobics shoes. Its primary target audience had been high school girls and female college students. Currently, Legacki explained, Kaepa's Japanese business was "broader" and "more fashion-oriented" than in the United States; for 1994, he envisioned Kaepa's Japanese strategy to come more in line with its U.S. strategy, with "more emphasis . . . on Kaepa cheerleading and volleyball." According to the minutes of the

6

March 23, 1993 meeting between Achilles and Kaepa, Legacki reiterated this strategy, expressing his desire to "excite the Japanese market" with cheerleading shoes.

In light of these statements, it is clear that Kaepa intended to move toward more emphasis on its niche brand positioning in Japan, while hoping to maintain some presence in the men's brand markets (though its Japanese sales in all product areas had been down in recent years). There is no evidence that Achilles intended to diverge from this strategy.

3. The March 17, 1993 meeting between Kaepa Vice-President John Holsinger (Holsinger), who was in charge of Kaepa's Asian operations, and various Achilles officers at Achilles's offices regarding the selection of Kaepa products to be marketed in Japan by Achilles. According to Holsinger, the Achilles officers expressed the most interest in marketing women's shoes; Holsinger objected and pointed out that Kaepa had historically been successful selling men's tennis and basketball shoes. The Achilles officials then assured Holsinger that they would market a broader range of products.

Whatever inference of fraudulent intent on Achilles's part that this episode might suggest evaporates in light of the fact that on March 24, 1993, Kaepa and Achilles officials jointly selected seventeen models of shoes to be marketed in Japan, twelve of which were women's models. Kaepa and Achilles conducted extended meetings in Tokyo on March 23-25, 1993. This selection

7

signaled a clear move away from the strategy Kaepa had employed with Diawa, in which sixty-seven percent of its shoes in the Japanese market were men's. Legacki and Holsinger, among other Kaepa executives, attended this meeting and made no objection to the selection. Indeed, on April 6, 1993, Legacki wrote to Yagi to discuss the March 23-25 meetings, and noted that "the transition plan essentially reflects the model line-up that we agreed upon in our meeting." To illustrate the transition plan, Legacki included replicas of the charts that he presented at the meetings. The "Kaepa Global Strategies Japanese Transition" chart noted that in Japan, Kaepa would move away from its "fashion" oriented line toward a line with "more emphasis on U.S.A. products," including "cheerleading, volleyball, tennis." From these charts, it is clear that Kaepa wanted to streamline its strategies in both Japan and the United States, so that in both markets Kaepa would use its predominantly women's "niche" shoes to obtain a "critical mass" and then expand into a more full-range product line. The only perceptible difference reflected by these charts between Kaepa's Japanese and Untied States strategies appears to be that in Japan, Kaepa would maintain something of a "broad line," which presumably would include some men's shoes. Achilles' actions–selecting *some* men's shoes and marketing them–is consistent with this strategy.

4. Achilles's representations during the negotiation period that it was an experienced company which knew the Japanese athletic

8

shoe market well and would achieve better results for Kaepa than Diawa. Achilles's puffery about its expertise in the Japanese market were not misrepresentations of material fact and thus do not demonstrate fraudulent intent. *See*, *e.g.*, *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (finding that statements that a building was "superb," "super fine," and "one of the finest little properties in the City of Austin" were not misrepresentations of material fact, but instead expressions of opinion that could not constitute fraud); *Dyer v. Caldcleugh & Powers*, 392 S.W. 2d 523, 530 (Tex. Civ. App.–Corpus Christi 1965, writ ref'd n.r.e.). Statements that are merely predictions, such as outselling Diawa, are similarly not actionable. *See Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 680 (5th Cir. 1986) (applying Texas law to hold that a prediction of film's box office success was an opinion only and not actionable as a fraudulent misrepresentation).[1]

5. The March 26, 1993 meeting of the Achilles board of directors, at which Yagi stated that Achilles would concentrate on Kaepa's "ladies goods for the present." As discussed above, shifting Kaepa's focus in Japan to concentrate primarily on the

---

[1] We also observe that the distributorship agreement contained no requirement that Achilles purchase a set minimum number of shoes from Kaepa; Achilles agreed only to work toward projected "target purchases." In the event that Achilles did not achieve its "targeted purchases," Kaepa would have the option of terminating the agreement but could not hold Achilles liable for any damages for not achieving these figures.

women's niche products was exactly the strategy that Legacki outlined at various points during the negotiation process. Kaepa also points to Yagi's statement at this meeting that Achilles would sell 200,000 pairs in the first year as evidence that Achilles intended to breach the distribution agreement before ever signing it. Achilles was to purchase 1,440,000 pairs of shoes from Kaepa during the first forty-two months. However, it does not follow from projections for the first twelve months that Achilles intended not to meet its targeted figure for the first forty-two months. Moreover, the fact that Achilles was planning to sell 200,000 in the first year, followed by 550,000 "in an early period" (as Yagi stated) is not inconsistent with the agreement's target figures. If Achilles had sold 200,000 the first year, and 550,000 per year for the following years (assuming that is what the "early period" meant), it would have exceeded that figure.[2]

6. The "Yamada Report," an Achilles marketing report that Kaepa believes demonstrates Achilles's intent to relegate Kaepa to a women's only niche brand by listing Kaepa's main categories as "Cheer, Volleyball, Tennis." This "report" does not help Kaepa's cause. First, it is not shown to be anything more than a mere reprint of an independent trade publication journal article, which

---

[2] Shoe sales of 200,000 pairs for year one, 496,000 pairs for years two and three, 248,000 pairs for the first six months of year four would equal the 1,440,000 figure for the first forty-two months. If Achilles sold 550,000 pairs in year two, it would be 54,000 pairs ahead of schedule.

had been received by an Achilles executive.  Second, the content of this report is inconclusive because in another section it lists as Kaepa's main categories of shoes "men's tennis, lady's fitness, and men's basketball."

7.  The "Asatsu" plan, an unsolicited advertising proposal from the Asatsu advertising agency that suggests, among other things, a decidedly feminine Kaepa logo.  Like the Yamada report, this evidence does not support any possible finding of fraudulent intent on the part of Achilles.  First, the proposal was the unsolicited work of a third party.  Second, the proposal itself contains many possible marketing plans, including running ads in men's magazines.

8.  The June 2, 1993 press conference in Tokyo announcing the formation of the Kaepa-Achilles distribution agreement.  Yagi sent to Legacki a copy of Achilles's proposed press release, which discussed launching the "New Kaepa" with a focus on "promising categories such as cheerleader and volleyball."  The release also stated that Achilled would "enrich especially [the] ladies['] field" through its marketing of Kaepa.  In response, Legacki did not object to this characterization of Achilles's strategy for Kaepa, even though he made a suggestion regarding the release's mention of an air intake system.  In his remarks for the press conference, Legacki included a history of Kaepa's success in the United States market, noting its primary focus on tennis and cheerleading models.  This statement is telling in light of Keapa's

11

stated plan to refocus its Japanese strategy to mirror, essentially, its U.S. strategy.

In light of this evidence, it is clear that Achilles's actions were no surprise to Kaepa.  Any disagreement, as evidenced by Legacki's March 16 letter, apparently revolved around Kaepa's concern that Achilles was going to market Kaepa as a women's brand *forever*, not just in the short-term.  However, there is no indication that Achilles ever intended to thus relegate Kaepa only to a women's brand niche.  It did order significant quantities of men's shoes and advertised them accordingly.  While the overall focus of their activities for 1993-94 was directed at women's shoes, that strategy comports with the strategy mutually agreed on by Kaepa and Achilles.  The breakdown in communications between the parties appears to have resulted from a disagreement over the length of the transition period, or how closely Achilles was to mirror in Japan Kaepa's United States strategy (where Kaepa *was* a niche brand), particularly while both parties were attempting to dispose of the residual, heavily discounted inventory from Diawa.  In sum, we agree with the district court that, considering the record as a whole, no reasonable jury could find that Achilles fraudulently induced Kaepa to enter into the distributorship agreement.  We therefore affirm the district court's entry of judgment as a matter of law on that claim.

II.  Kaepa's Motion for a New Trial

12

In its second point on appeal, Kaepa argues that the district court erred in denying its motion for a new trial. In its brief, Kaepa asserts that the jury's finding that Kaepa waived any breach of contract by Achilles was "against the great weight of the evidence." As such, Kaepa urges this Court to find that the district court abused its discretion in not granting a new trial under FED. R. CIV. P. 59. Kaepa argues that Achilles's evidence demonstrated only mutual agreement to modify the contract, not any waiver by Kaepa of Achilles's contractual obligations. According to Kaepa, this evidence was thus not "factually sufficient" to support the jury's finding of waiver. However, a Rule 59 motion addresses the weight, not the sufficiency, of the evidence. *See*, *e.g.*, *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 367 (5th Cir. 1980) (finding a trial court abused its discretion by granting a new trial because the jury's conclusions were at least as likely to be true as any other and were not against any great evidentiary weight). An argument about the sufficiency of the evidence is more akin to a Rule 50(a) motion for judgment as a matter of law. A court may grant a Rule 50(a) motion if it determines that a reasonable jury could draw inferences from the evidence to support a finding in favor of one party only. *See* *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313 (5th Cir. 1997), *cert. denied*, 118 S.Ct. 871 (1998). Kaepa appears to be arguing that Achilles failed to adduce any evidence that would allow a

13

reasonable jury to conclude that Kaepa waived the breach by Achilles. Having reviewed the briefs and record, we cannot agree that there was no evidence to support the jury's finding of waiver. Specifically, we note the numerous instances in which Kaepa acted in concert with Achilles's focus of its initial marketing efforts on Kaepa's women's niche shoes.

Achilles argues that since Kaepa was essentially moving for judgment as a matter of law, and since Kaepa failed to file a Rule 50(a) motion before the close of evidence, this Court should evaluate the district court's ruling under the more deferential "clear error" standard of review. *See United States ex rel. Wallace v. Flintco*, 143 F.3d 955, 963 (5th Cir. 1998). Kaepa contends that it only wanted a new trial under Rule 59, and this Court should instead apply the abuse of discretion standard of review. This point is ultimately irrelevant. Even if this Court construed Kaepa's motion as a Rule 59 motion, and reviewed the district court's denial for an abuse of discretion, Kaepa has not overcome the very high standard that would allow this Court to find *both* the jury *and* the district court in error on an issue of evidentiary weight. *See* 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 59.54[4][a] (2d ed. & Supp. 1999) ("[W]hen the trial court denies a Rule 59 motion based on the claim that the verdict is against the clear weight of evidence, that determination is virtually unassailable on appeal.").

14

We note that Kaepa has not brought forward any complaint of the jury charge or verdict form.

Kaepa has not demonstrated that the district court erred in refusing to grant it's motion for a new trial.

III.  Court Costs

On its cross-appeal, Achilles challenges the district court's determination that each party bear its own costs.  Despite the fact that it was unsuccessful on its counterclaims, Achilles contends that because Kaepa did not prevail on *its* claims, Achilles was, for all intents and purposes, the prevailing party under FED. R. CIV. P. 54(d)(1)[3], and is therefore entitled to its costs.  We review the decision to award costs for abuse of discretion.  *See Soderstrum v. Town of Grand Isle*, 925 F.2d 135, 141 (5th Cir. 1991).

We conclude that the district court did not abuse its discretion in ordering each party to bear its own costs.  Rule 54(d) directs that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."  Under this rule, "the decision to award costs turns on whether the party, as a practical matter, has prevailed." *Schwartz v. Folloder*, 767 F.2d 125, 130 (5th Cir. 1985).  Achilles

---

[3]  FED. R. CIV. P. 54(d)(1) provides in relevant part:

> "Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."

15

cites cases that support the proposition that under certain circumstances "successfully avoid[ing] a potentially multi-million dollar judgment" can amount to "prevailing" for the purpose of awarding costs. *See O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 571-72 (7th Cir. 1994); *see also Scientific Holding Co., Ltd. v. Plessey Inc.*, 510 F.2d 15, 28 (2d Cir. 1974). Unlike the present case, however, those cases affirmed the district court's cost awards. In other words, under our deferential standard of review, these reviewing courts simply found that there was not such a "clear abuse of discretion" as to require overturning the award. *See In re Nissan Antitrust Litig.*, 577 F.2d 910, 918 (5th Cir. 1978). Similarly, this case does not present such an egregious abuse of discretion that this Court must overturn its cost award. Achilles failed to obtain a favorable judgment on its breach of contract counterclaim. "A trial judge has wide discretion with regard to the costs in a case and may order each party to bear his own costs." *Hall v. State Farm Fire & Cas. Co.*, 937 F.2d 210, 216 (5th Cir. 1991). Courts of appeals have found no abuse of discretion by district courts that have ordered each party to bear its own costs when, as here, the cases end in a "draw." *See Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 517 (7th Cir. 1990) (finding that "[b]oth Barrett and A&O prevailed in part, and therefore we cannot say that the district court abused its discretion" in making each party bear its own costs); *In re*

16

*Corrugated Container Antitrust Litig.*, 756 F.2d 411, 418 (5th Cir. 1985) ("The jury found for the plaintiffs in part and for the defendants in part.  The trial court acted within its discretion in its assessment of costs.").  We similarly find that in this case, in which both Kaepa and Achilles survived each other's claims, that the district court did not abuse its discretion in ordering each side to bear its own costs.

### Conclusion

AFFIRMED.

Costs on this appeal adjudged as follows: three-fourths against Kaepa; one-fourth against Achilles.