In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-2611

KRUEGER INTERNATIONAL, INC.,

*Plaintiff-Appellant*,

*v.*

ROYAL INDEMNITY CO.,

*Defendant-Appellee*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-C-563—**William C. Griesbach**, *Judge*.

———————

ARGUED JANUARY 10, 2007—DECIDED APRIL 9, 2007

———————

Before POSNER, MANION, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. With the growth of employers' liability for discrimination, retaliation, harassment, wrongful termination, and other, similar torts committed against employees (torts not involving physical injury and therefore not preempted by workers' compensation), demand has grown for "employment practices liability" insurance. James B. Dolan Jr., "The Growing Significance of Employment Practices Liability Insurance," *GP Solo Magazine*, Sept. 2005, www.abanet.org/genpractice/magazine/2005/sep/employmentinsurance.html. Despite that growing demand, the present suit—a diversity breach of contract

suit governed by Wisconsin law—is one of only a handful of cases (none germane to the issues in this case) in which an appellate court has been asked to interpret such coverage.

Krueger International, a manufacturer of furniture, argues that Royal Indemnity, its liability insurer, is obliged to indemnify it for a $5.3 million judgment that a Wisconsin court entered against it in a suit by former employees. The district court granted summary judgment for Royal.

The insurance policy that Royal issued to Krueger covers a "loss" to the insured due to an "employment wrongful act," capaciously defined as

> any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by the Company or one or more Insured Persons in their capacities as such, in connection with any actual or alleged wrongful dismissal, discharge or termination of employment, breach of any oral or written employment contract or quasi-employment contract, employment-related misrepresentation, violation of employment discrimination laws (including sexual or other illegal workplace harassment), wrongful failure to employ or promote, wrongful discipline, wrongful deprivation of a career opportunity, failure to grant tenure, failure to adopt adequate workplace or employment policies and procedures, illegal retaliatory treatment, negligent evaluation, invasion of privacy, employment-related defamation or employment-related wrongful infliction of emotional distress.

The suit that resulted in the judgment that Krueger wants Royal to indemnify it for was brought by four former

employees of Krueger. They owned stock in the company and their shareholder agreements gave the company an option to redeem their shares if they left its employ. Krueger could exercise the option at any time within 90 days after the employee notified the company that he would be leaving. If it exercised the option, the employee would be entitled to the assessed valuation of his shares as of the end of the quarter before the exercise. Authority to modify the shareholder agreement was placed in the company's board of directors.

The four employees charged that when late in 2000 they discussed the financial implications of their resigning with Krueger's chief financial officer (and board member), Mark Olsen, he told them that if they resigned by the end of the year their stock would be redeemed at its assessed value as of the end of the third quarter of that year. So they resigned before the end of 2000. But Krueger didn't exercise its option to redeem their shares until 2001, and it used as the redemption value the assessed value of the shares at the end of the last quarter of 2000—a lower value than the shares had had three months earlier. The employees sued Krueger for the difference, on various theories including negligent misrepresentation. But the only theory the judge allowed to go to the jury was that Olsen had orally modified the plaintiffs' employment contracts to entitle the plaintiffs to the third-quarter valuation. The jury agreed, stating that Olsen had had "apparent authority" to modify the contracts.

The insurance policy covers breach of an *oral* employment contract; losses attributable to the breach of a written contract are excluded. The claim of the four former employees was based on Olsen's *oral* modification of a *written* contract, and whether such a modification falls

within the exclusion for suits on a written contract cannot be gleaned from the language of the policy; an orally modified written contract is an oral-written hybrid. But the purpose behind the distinction that the policy makes between oral and written contracts provides a clue to how the policy applies to this case. The employer will usually have control over the written contracts that it makes. The coverage it needs is of oral representations by its employees that may be held to have created binding contracts; for over those representations it has little control. The need, so understood, for coverage extends to an oral modification of a written contract, since the employer has no greater control over an oral modification than it does over any other oral representations by its employees.

It is true that the company could provide in its written contracts that oral modifications were unenforceable. But it might not want to fetter its trusted employees in that way, and anyway the provision might be ruled unenforceable, consistent with the traditional common law rule that a contractual provision forbidding oral modifications can itself be modified orally. *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 518 (7th Cir. 1990) (Wisconsin law); *Call v. Ameritech Management Pension Plan*, 475 F.3d 816, 820 (7th Cir. 2007); *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572-73 (6th Cir. 2003).

But the oral-written issue turns out to be unimportant in the present case. The redemption provision that, as orally modified, is the basis of the employees' claim is part of a shareholders' agreement, not an employment agreement. The shareholders' agreement is applicable to any shareholder, including an employee, but that doesn't make it an employment agreement. The breach of a shareholder agreement, whether oral or written, is not covered by

insurance against employment practices liability. So the only coverage on which Krueger can hang its hat is the coverage created by the provision insuring it against losses resulting from misleading statements.

However, the Wisconsin court dismissed the employees' claim of negligent misrepresentation. The only claim they prevailed on was their contract claim to a higher redemption price. Apart from the fact that only breach of an *employment* contract is covered, insurance policies are presumed not to insure against liability for breach of contract. *Moran Foods, Inc. v. Mid-Atlantic Market Development Co.*, 476 F.3d 436, 439 (7th Cir. 2007); *May Department Stores Co. v. Federal Ins. Co.*, 305 F.3d 597, 602 (7th Cir. 2002); *Ingalls Shipbuilding v. Federal Ins. Co.*, 410 F.3d 214, 222 (5th Cir. 2005); *Pacific Ins. Co. v. Eaton Vance Management.*, 369 F.3d 584, 593 (1st Cir. 2004); *Data Specialties, Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909, 913 (5th Cir. 1997). The reason is the severe "moral hazard" problem to which such insurance would often give rise. The term refers to the incentive that insurance can create to commit the act insured against, since the cost is shifted to the insurance company. An example is the incentive to burn down one's house if the house is insured for more than its value to the owner. Or suppose, having somehow persuaded an insurance company to insure you against liability for breach of contract, you hire a contractor to build an extension on your house and after he has completed his work you refuse to pay him, and, when he sues, you turn his claim over to the insurance company.

Moral hazard provides a further explanation for the distinction that the policy makes between written and oral contracts. The breach of a written contract will often be a deliberate act by the insured, while the breach of a con-

tract created by an oral representation of an employee is likely to be, from the insured's standpoint, an unavoidable accident. The difference lies in the nature of the act that precipitates the breach: a deliberate decision by the insured, on the one hand, and the careless or unauthorized act of an employee on the other. Thus, as Krueger points out, relying on the Wisconsin Supreme Court's authoritative decision in *American Family Mutual Ins. Co. v. American Girl, Inc*, 673 N.W.2d 65, 76-79 (Wis. 2004), the presumption against liability for breach of contract is stated too broadly. If the act that precipitates the insured's liability is negligent and therefore tortious, the fact that it's also a breach of contract does not preclude coverage, since coverage is based on the specific acts insured against rather than on the particular remedy sought by the person harmed by the act. *Vandenberg v. Superior Court*, 982 P.2d 229, 245-46 (Cal. 1999); *Lamar Advertising Co. v. Continental Casualty Co.*, 396 F.3d 654, 656-57 and n. 2 (5th Cir. 2005); *Touchette Corp. v. Merchants Mutual Ins. Co.*, 429 N.Y.S.2d 952, 953 (App. Div. 1980).

In some jurisdictions, indeed, if through negligence the contractor in our earlier example had caused physical damage to your property, you could sue him both in tort and in breach of contract; and his liability insurance, if it covered the accidental infliction of harm to the property of the contractor's customers, would be good against either claim. *Ferrell v. West Bend Mutual Ins. Co.*, 393 F.3d 786, 794-95 (8th Cir. 2005); *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945-46 (11th Cir. 1982). Even if the accident caused merely "economic loss," which is to say loss not involving damage to person or property, so that under the "economic loss" doctrine the loss could be recovered if at all only in a suit for breach of contract, *1325 North Van Buren, LLC v. T-3*

*Group, Ltd.*, 716 N.W.2d 822, 831 (Wis. 2006); *Insurance Co. of North America v. Cease Electric Inc.*, 688 N.W.2d 462, 468-72 (Wis. 2004); *Rich Products Corp. v. Kemutec Inc.*, 241 F.3d 915, 917-19 (7th Cir. 2001) (Wis. law); *Flintkote Co. v. Dravo Corp.*, *supra*, 678 F.2d at 945-47, a liability insurance policy might (depending on the precise wording of the policy—in particular on whether it limited "property damage" to physical damage) cover the loss the contractor had incurred as a result of the suit. *Eljer Mfg., Inc. v. Liberty Mutual Ins. Co.*, 972 F.2d 805, 809-12 (7th Cir. 1992); *French v. Assurance Co. of America*, 448 F.3d 693, 703 (4th Cir. 2006); *Lucker Mfg., Inc. v. Home Ins. Co.*, 23 F.3d 808, 814-18 (3d Cir. 1994).

Krueger argues that Olsen's action in "modifying" the shareholders' agreement in favor of the four employees who resigned exceeded his authority, and that an unauthorized act that may bind the company under contract law is from a practical standpoint no different than if Olsen had sexually harassed an employee and Krueger been held liable in tort to the employee under the doctrine of respondeat superior. Royal argues that Krueger suffered no "loss" within the meaning of the policy because all that the plaintiffs in the suit against the company obtained was their contractual entitlement. But the loss consisted in Krueger's being forced to pay money as the consequence not of the shareholders' agreement but (Krueger claims) of an employee's unauthorized act.

We also don't agree with Royal that since Olsen's promise conferred a contractual entitlement on the departing employees, Krueger's refusal to honor the entitlement, forcing them to sue, must have been just the kind of deliberate breach of contract that insurance companies do not insure against. Krueger's refusal to honor Olsen's

promise was the only way it could challenge his author-
ity to bind the company. An insured who broke an oral
employment contract would be forced to pay damages
for the breach, yet we know that it would be entitled to be
indemnified by the insurance company.

The judge dismissed the employees' claim of negligent
misrepresentation (that is, that Olsen had misrepresented
to them what would happen if they resigned by the end of
the year) on the ground not that there had been no negli-
gent misrepresentation, but that a tort claim arising from
Olsen's promise was barred by the economic loss doctrine.
For in some states the doctrine precludes a tort suit for
purely economic loss against someone with whom you
have a contract, even if it is a suit for misrepresentation.
*Cerabio LLC v. Wright Medical Technology, Inc.*, 410 F.3d 981,
987-88 (7th Cir. 2005) (Wisconsin law); *Home Valu, Inc. v.
Pep Boys*, 213 F.3d 960, 963-64 (7th Cir. 2000) (same); *All-
Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866-67 (7th
Cir. 1999) (same). But we know that the fact that the
economic loss doctrine may channel tort-like conduct
into breach of contract need not affect insurance coverage.
And so the fact that the jury found only "contract modifi-
cation" is not dispositive; if the modification was precipi-
tated by an insured-against act, namely a misrepresenta-
tion by Olsen, there is coverage. A misrepresentation
can give rise to a tort, but it can also bind a principal and
thus give rise to a contract claim. In either case it can
inflict a loss covered by employment wrongful acts insur-
ance, since the insurance is against liability for the conse-
quences of an act, not liability based on a particular legal
theory, such as tort.

This analysis brings Krueger to the verge of victory. But
there it falters, because, although the shareholders' agree-

ment is clear, and only the board of directors has express authority to modify it, there was no misrepresentation. As explained by the Wisconsin appellate court in the employees' suit:

> those acts within the scope of the agent's authority are the acts of the corporation. A principal may not cloak an agent with vestiges [*sic*—the court must have meant 'vestments'] of authority only to renounce the agent's authority to represent it after others have dealt with the agent to their detriment. Krueger's argument suggests that a corporation should not be held responsible for the commitments of its agents if the board of directors subsequently disapproves of the agent's decision.

That is the language of actual authority. And Krueger had argued in the employees' suit that it "did not acquiesce in" Olsen's representations—an argument irrelevant to apparent authority. The court had rejected the argument, saying that

> the evidence suggested that Krueger's president and majority shareholder, consistent with the corporation bylaws, delegated stock redemption responsibilities to Olsen…. The board was aware of Olsen's exclusive role in stock redemption transactions by virtue of the thirty-five to forty transactions he handled between 1995 and 2000. Krueger's own evidence suggests that the board merely served as a 'rubber stamp' after the fact for stock redemption transactions effectuated by Olsen.

In other words, in promising the employees the third-quarter valuation, Olsen was exercising a power that had been delegated to him by the board of directors (which is authorized to modify the shareholders' agreement). The

board merely repudiated his exercise of that delegated power when it found out what it would cost. Thus the judge was using the term "apparent authority" when he meant implied authority. Implied authority, unlike apparent authority, is actual authority, simply inferred rather than expressed. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064-65 (7th Cir. 2000); *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 64 (2d Cir. 2006).

Krueger argues that we must not look behind the jury's finding, which was that Olsen had "apparent authority," implying that he exceeded his authority and bound Krueger only by virtue of the appearance of authority that he manifested to the employees. The question, however, is what the jury meant by its finding, and the best evidence of that is what the appellate court said. Krueger itself wants us to look behind the verdict, because the verdict says nothing about a misrepresentation. It is apparent from the appellate court's discussion that Olsen did *not* misrepresent the departing employees' shareholder rights. He had the authority to commit Krueger to value their shares at the third-quarter assessment, and exercised it. When he told the employees they would get the third-quarter valuation if they resigned by the end of the year, he was telling the truth because he was binding Krueger to his promise, as he was authorized to do. That the board later disapproved Olsen's exercise of the authority didn't mean he hadn't had it when he exercised it.

As there was neither a breach of an oral employment agreement nor a misrepresentation, there was no insurable act and the judgment for Royal is therefore

AFFIRMED.

No. 06-2611                                                        11

A true Copy:

  Teste:

          _____
          *Clerk of the United States Court of*
           *Appeals for the Seventh Circuit*