ROYSTER-CLARK, INC., Plaintiff-Appellant,

v.

OLSEN'S MILL, INC.,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2003AP1534. Oral argument February 21, 2006.
—Decided May 18, 2006.*

2006 WI 46

(Also reported in 714 N.W.2d 530.)

266

For the defendant-respondent-petitioner there were briefs by *John B. Selsing, James D. Peebles,* and *Selsing Law Office,* Berlin, and oral argument by *James D. Peebles.*

For the plaintiff-appellant there was a brief by *Brian D. Hamill* and *Dempsey, Williamson, Young, Kelly & Hertel, LLP,* Oshkosh, and oral argument by *Brian D. Hamill.*

¶ 1. N. PATRICK CROOKS, J. Petitioner, Olsen's Mill, Inc. (Olsen's Mill), seeks review of an unpublished court of appeals' decision[1] that reversed and remanded the decision of the circuit court in a contract dispute. We address two principal issues on appeal. First, whether the circuit court's finding that there was an oral agreement to modify a contract between Royster-Clark, Inc. (Royster) and Olsen's Mill was clearly erroneous. Second, whether Olsen's Mill owes Royster interest for late payment on a second, oral, contract.

¶ 2. We reverse the decision of the court of appeals. Doing so, we hold that the circuit court's finding of fact regarding the oral modification was not clearly erroneous, as there was sufficient evidence in the record from which the circuit court could reasonably find that a valid oral modification had occurred. Because we determine that the circuit court's finding of an oral modification was not clearly erroneous, and because we determine that the circuit court was legally correct in its conclusion that Olsen's Mill was entitled to a setoff against the money it owed Royster on the second contract, we are

---

[1] *Royster Clark, Inc. v. Olsen's Mill, Inc.,* No. 2003AP1534, unpublished slip op., (Wis. Ct. App. June 30, 2005).

satisfied that Royster has no basis for its claim of interest due.

I

¶ 3. In 2001, Royster and Olsen's Mill entered into two contracts with one another. The first was a written contract, dated January 21, 2001, for Olsen's Mill to purchase 2000 tons of 32 percent nitrogen fertilizer from Royster at $192 per ton. This product is principally used to fertilize corn, and is applied at the time of planting. Olsen's Mill had sufficient storage capacity to take the entire product at any time. Under the terms of the contract, Olsen's Mill prepaid Royster for the entire order, which came to $384,000. Payment was made on the nitrogen fertilizer on January 29, 2001. The contract expressly provided that it was subject to the provisions of the Uniform Commercial Code (UCC), and contained language that prohibited oral modification of the contract.[2] The contract further

---

[2] The nitrogen contract provides, in relevant part:

3. INTERPRETATION—Except to the extent inconsistent with the expressed terms of this contract, this contract shall be governed by and interpreted pursuant to the provisions of the Uniform Commercial Code as enacted in the State of Illinois, USA, and embodies the entire agreement between seller and buyer relative to the sale and purchase of the goods described herein. No additional or different terms shall be binding on seller unless specifically accepted by seller in writing.

The court of appeals noted that, "[d]espite this unambiguous provision, both parties stipulate we should apply the UCC as interpreted by Wisconsin law." *Royster*, unpublished slip op., ¶ 2 n.3. Furthermore, in its brief to this court, Royster explicitly acknowledges that the "parties have agreed that Wisconsin law governs." While making no similar statement, Olsen's Mill's brief implicitly concedes that Wisconsin law applies, arguing,

called for delivery[3] by June 30, 2001. Both parties regarded this date as the end of the fertilizer "crop year," as it was unlikely to be used by farmers after that date. The nitrogen contract also reserved the right for Royster to impose a storage fee upon fertilizer that was not removed from Royster's facility by that date.

¶ 4. When the crop year began, the supply of 32 percent nitrogen fertilizer was scarce. Olsen's Mill cooperated with Roger Ralston (Ralston), a Royster sales agent, in his efforts to coordinate distribution of the fertilizer to various buyers so that no buyer would come up short. During this time, Royster provided approximately 700 of the contracted 2000 tons of nitrogen fertilizer to Olsen's Mill. Because of Royster's rationing, Olsen's Mill was forced to purchase an additional 1,000 tons of the same nitrogen fertilizer from a Royster competitor, in order to fulfill its obligations to its own customers.

¶ 5. The second contract between the companies was an oral contract in which Olsen's Mill agreed to purchase from Royster a batch of Super Rainbow, a different type of fertilizer used mainly on potato crops. Although Olsen's Mill did not need a full batch, because this product was mixed in batches, it was not feasible

among other things, that the court of appeals did not follow Wisconsin law in rendering its decision.

[3] The contract provided the sale was free on board (FOB). "FOB is a delivery term requiring a seller (here Royster) to ship goods to a designated point and bear the expense and risk of putting them into the possession of the carrier." *Royster*, unpublished slip op., ¶ 2 n.2 (citation omitted). However, as the court of appeals noted, apparently this was not a "vigorously enforced" term of the contract. *Id.* "Delivery" took place when Olsen's Mill sent its own trucks to be filled at Royster's plant in East Dubuque.

for Royster to mix the additional small quantity Olsen's Mill needed. The agreement, therefore, called for Olsen's Mill to take a full batch, sell what it could in 2001, and store the remainder until it could be sold in 2002. Payment to Royster was to be based upon Olsen's Mill's sales of the product that year, which would be determined at the end of the crop year, when Royster could assess how much Super Rainbow Olsen's Mill sold in 2001.

¶ 6. Beginning April 28, 2001, excessive rain interrupted regular agricultural activity, causing farmers to delay planting corn. As a result, the demand for nitrogen fertilizer dropped precipitously, as did the fertilizer price. Paul Olsen (Olsen), president of Olsen's Mill, contacted Ralston to discuss the situation. Olsen's Mill sought to terminate or buy out its contract with Royster, as did many other Royster customers. Instead of terminating the contract, Royster wanted Olsen's Mill to take all of Royster's remaining nitrogen fertilizer. In return for doing so, concessions on the nitrogen contract were discussed, in the form of either a rebate or a credit for the remaining prepaid 1300 tons based upon the current market price. Following these discussions, Olsen's Mill retracted its buyout request, took all the remaining nitrogen fertilizer, amounting to the remaining 1300 tons on the contract, plus an additional 34.6 extra tons, and sold it at a loss.

¶ 7. Royster demanded full payment for its invoice. Olsen's Mill responded by claiming offsets for the Super Rainbow, as well as a refund on part of its prepayment of the nitrogen contract based upon the oral modification.

¶ 8. Royster then sued Olsen's Mill, seeking to collect the outstanding balance owed on the 34.6 tons of the nitrogen fertilizer, as well as payment for the Super

Rainbow fertilizer. Olsen's Mill counterclaimed, alleging an overpayment on the original nitrogen contract.

¶ 9. The issues at trial, after the parties had stipulated to or settled certain issues, were Olsen's Mill's counterclaim alleging the contract for nitrogen fertilizer had been orally modified and Royster's claim for interest owed on the unpaid Super Rainbow contract.

¶ 10. The circuit court, Judge Lewis R. Murach presiding, after hearing testimony from Olsen, Ralston, and a Royster executive, Roger Rainey (Rainey), determined that the nitrogen contract had been orally modified the second week of June 2001 when Olsen agreed to take the balance of Royster's nitrogen fertilizer in return for either an offsetting credit or free future product. Therefore, the circuit court held that Olsen's Mill was entitled to a rebate of $83,000 on the 1300 tons of nitrogen fertilizer.[4] The circuit court used the $83,000 owed to Olsen's Mill to offset the $54,278.31 Olsen's Mill stipulated it owed Royster on the Super Rainbow contract, awarding Olsen's Mill $28,721.69, and also determined that Royster was not entitled to interest on the Super Rainbow contract.

II

¶ 11. The standard of review we apply to a circuit court's findings of fact is highly deferential. Wisconsin statutes require that a circuit court's "[f]indings of fact shall not be set aside unless clearly erroneous . . . ." Wis.

---

[4] The circuit court calculated the $83,000 as follows: contract price of $192/ton less the market price for the product on July 1, 2001, of $115.00/ton, times 1300 tons delivered after July 1, 2001 = $83,000.

Stat. § 805.17(2)(2003–04)[5]; *see also State v. Van Camp,* 213 Wis. 2d 131, 140, 569 N.W.2d 577 (1997). In other words, this court defers to the circuit court's findings of fact unless they are unsupported by the record and are, therefore, clearly erroneous. *Mentzel v. City of Oshkosh,* 146 Wis. 2d 804, 808, 432 N.W.2d 609 (Ct. App. 1988)(citing Wis. Stat. § 805.17(2)).

¶ 12. A circuit court's findings of fact are clearly erroneous when the finding is against the great weight and clear preponderance of the evidence. *Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983). Under the clearly erroneous standard, "even though the evidence would permit a contrary finding, findings of fact will be affirmed on appeal as long as the evidence would permit a reasonable person to make the same finding." *Reusch v. Roob,* 2000 WI App 76, ¶ 8, 234 Wis. 2d 270, 610 N.W.2d 168 (citation omitted). Moreover, we search the record not for evidence opposing the circuit court's decision, but for evidence supporting it. *See Mentzel,* 146 Wis. 2d at 808.

¶ 13. "This court reviews conclusions of law independently and without deference to the decision of the circuit court." *Hillegass v. Landwehr,* 176 Wis. 2d 76, 79, 499 N.W.2d 652 (1993) (citation omitted). Statutory interpretation is an issue of law which we review independently of lower court decisions. While our review is de novo, this court benefits from the analyses of the circuit court and the court of appeals. *State v. Anderson,* 2005 WI 54, ¶ 23, 280 Wis. 2d 104, 695 N.W.2d 731

---

[5] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

(citing *State v. Waushara County Bd. of Adjustment*, 2004 WI 56, ¶ 14, 271 Wis. 2d 547, 679 N.W.2d 514).

¶ 14. Given the high level of deference we must afford the circuit court's findings of fact, and for the further reasons discussed herein, we determine that its finding that Royster and Olsen's Mill entered into an oral contract in mid-June 2001 to modify their written agreement for the nitrogen fertilizer, was not clearly erroneous.

### III

¶ 15. Royster maintains that the UCC governs the contract, and that both the UCC statute of frauds and the contract itself require that modifications must be in writing. The nitrogen contract between Royster and Olsen's Mill expressly provides for such, stating "this contract shall be governed by and interpreted pursuant to the provisions of the Uniform Commercial Code. . . ." The contract additionally provides that "[n]o additional or different terms shall be binding on seller unless specifically accepted by seller in writing." *See, e.g.,* Wis. Stat. § 402.209(2); *see also* 810 ILCS 5/2–209(2)(2005).

¶ 16. Olsen's Mill acknowledges the applicability of the UCC. However, Olsen's Mill argues that there are recognized exceptions to the statute of frauds requirement that a contract for goods in excess of $500 be in writing, and that this modification falls within two of those exceptions to wit: that Royster had waived its writing requirement by its course of conduct, and that Olsen's Mill and Royster had partly performed the modified contract.[6]

---

[6] In addition to its arguments concerning waiver and performance, Olsen's Mill also maintains that the court of appeals

¶ 17. The UCC statute of frauds provides that "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties. . . ." Wis. Stat. § 402.201(1). We agree with both the court of appeals and the circuit court that the UCC governs the nitrogen contract, as it is a contract for the sale of goods, and that the contract is required to satisfy the terms of the statute of frauds, since the price of the goods exceeds $500.

¶ 18. The UCC further requires agreements to modify a contract, subject to the UCC, to be in writing. Wisconsin Stats. § 402.209(3) provides that "[t]he requirements of s. 402.201 must be satisfied if the contract as modified is within its provisions." Wis. Stat. § 402.209(3). In addition, the statute allows parties to require in the contract that modifications be in writing. Wis. Stat. § 402.209(2).[7]

¶ 19. In reality, however, not every contract for the sale of goods over $500, nor every modification

did not follow proper appellate procedure in that it failed to examine the entire record when ruling on the circuit court's decision. As evidence of this fact, Olsen's Mill cites a footnote in the court of appeals' decision, which states "[w]e review only Paul Olsen's testimony to determine whether there was an oral agreement to modify the nitrogen contract because the trial court found Olsen to be the more credible witness at trial." *Royster*, No. 2003AP1534, unpublished slip op., ¶ 7 n.7. However, it seems debatable whether the court of appeals did review the record beyond the testimony of Olsen; its opinion appears to have been based on a more extensive review than what was indicated in the footnote. It is clear, however, that the circuit court listened to and considered the testimony of Ralston, Olsen, and Rainey.

[7] "A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded. . . ." Wis. Stat. § 402.209(2).

thereof, strictly complies with the requirements of the statute of frauds, and it would be unreasonable to declare categorically all such contracts unenforceable. In recognition of this fact, both the UCC and Wisconsin case law have recognized exceptions to the statute of frauds. Two exceptions to the requirement that modifications be in writing are relevant to this case: waiver and performance. We will next consider whether the dealings between Royster and Olsen's Mill can satisfy either of the exceptions that the modification be in writing, and whether there is evidence to support the circuit court's finding that an oral modification of the nitrogen contract took place.

A

¶ 20. The first exception to the statute of frauds is waiver of the writing requirement. Wis. Stat. § 402.209(4); *see also Allen O'Hara, Inc. v. Barrett Wrecking,* 898 F.2d 512 (7th Cir. 1990). Section 402.209(4) states that "[a]lthough an attempt at modification or rescission does not satisfy the requirements of sub. (2) [clauses requiring that modifications be in writing are enforceable] or (3) [statute of frauds] it can operate as a waiver." Wis. Stat. § 402.209(4).[8]

---

[8] We note that in analyzing Wis. Stat. § 402.209, the Seventh Circuit Court of Appeals concluded "[a]n attempted modification by words or conduct . . . operates as a waiver only if the party seeking to enforce the attempted modification, reasonably relied on the attempted modification." *Am. Suzuzki Motor Corp. v. Kummer, Inc.,* 65 F.3d 1381, 1386 (7th Cir. 1995) (citing *Wisconsin Knife Works v. Nat'l Metal Crafters,* 781 F.2d 1280, 1286–87 (7th Cir. 1986)) (additional citation omitted). While this court has not held that reliance is necessary to effect a waiver, clearly Olsen's Mill relied on the oral modification to its detriment.

¶ 21. "Waiver involves an inquiry into the intent of the parties. . . ." *Allen,* 898 F.2d at 518. Moreover, "the intent to waive may be inferred as a matter of law from the conduct of the parties. . . ." *Christensen v. Equity Livestock Sale,* 134 Wis. 2d 300, 303, 396 N.W.2d 762 (1986)(citing *Hanz Trucking, Inc. v. Harris Bros. Co.,* 29 Wis. 2d 254, 265, 138 N.W.2d 238, 244 (1965)).[9] Waiver "is to be determined as a question of fact where the inference does not conclusively arise as a matter of law." *Id.*

¶ 22. The court of appeals in *Royster Clark, Inc. v. Olsen's Mill, Inc.* reasoned that an " 'attempt at modification' . . . contemplates a completed oral modification of a written contract which prohibits oral modification." *Royster-Clark, Inc. v. Olsen's Mill, Inc.,* No. 2003AP1534, unpublished slip op., ¶ 12 (Wis. Ct. App. June 30, 2005). The court of appeals then concluded that there was no evidence in the record of such an agreement, and as a result the court decided it need not further consider Wis. Stat. § 402.209. *Id.,* ¶ 13.

¶ 23. The inquiry into whether there has been an "attempt at modification" sufficient to operate as a waiver of the statute of frauds is closely related to the inquiry to determine whether there was a valid oral

---

[9] This court has " 'recognized that a provision in construction contracts requiring written change orders may be avoided where the parties evidence by their words or conduct an intent to waive or modify such a provision.' " *Allen O'Hara, Inc. v. Barrett Wrecking,* 898 F.2d 512, 518 (7th Cir. 1990) (citing *S&M Rotogravure Serv. Inc. v. Baer,* 77 Wis. 2d 454, 468, 252 N.W.2d 913 (1977)).

modification.[10] *See* Wis. Stat. § 402.209(4); *see also Allen,* 898 F.2d at 518. Generally speaking, if the record supports the inference that the parties intended to modify the contract, then a waiver pursuant to § 402.209 (4) has occurred.[11] We will address the two issues together.

¶ 24. As we noted previously, the standard of review we apply to a circuit court's findings of fact is that such findings will be upheld unless clearly erroneous. We, therefore, next examine whether there is sufficient evidence in the record from which the circuit court could have reasonably determined that the parties intended to waive the writing requirement.

¶ 25. There are at least five factors in the record to support the finding of the circuit court that an oral modification between Olsen's Mill and Royster took place.

¶ 26. First, the circuit court heard testimony from three witnesses: Olsen, Ralston, and Rainey. The circuit court judged Olsen to be forthcoming and his testimony the most credible of the three, and, thus, reasonably

---

[10] *See also Albany Roller Mills, Inc. v. N. United Feeds & Seeds, Inc.,* 397 N.W.2d 430, 433 (Minn. Ct. App. 1986) (The UCC § 2–209(4) requirement of a writing may be waived and result in an effective oral modification); *Double-E Sportswear Corp. v. Girard Trust Bank,* 55 F.R.D. 297, 301 (ED PA 1972) (An attempted modification of a written contract which does not satisfy the statute of frauds can operate as a waiver).

[11] *See also Linear Corp. v. Standard Hardware Co.,* 423 So.2d 966, 968 (Fla. Dist. Ct. App. 1982)("[T]he evidence as to the parties' conduct supports finding both a waiver of the requirement that subsequent modifications be in a writing signed by both parties, and that a subsequent modification occurred.")

gave greater weight to Olsen's testimony on the events in question. Because "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses," we do not second-guess the trier of fact in its credibility determinations. Wis. Stat. § 805.17(2).

¶ 27. Second, there is ample evidence in the record to support the circuit court's finding that Ralston had the apparent authority to bind his principal, Royster, to such an agreement. Ralston and Olsen both testified that, through Ralston, Royster entered into an oral contract for Super Rainbow with Olsen's Mill, during the same timeframe as the modification to the nitrogen contract was occurring. There was also testimony from Ralston and Olsen that Ralston had orally modified the standard invoice terms of the Super Rainbow contract. In addition, Ralston testified that he had the authority to make similar deals with other customers. As Olsen testified:

Q: Describe your normal dealings with Royster-Clark and Mr. Ralston in this business.

[Olsen Answering] A: We typically in the fertilizer industry, as we need product, no matter what supplier it is, it is virtually a [sic] verbal. We look at how many tons we need at what time of year, and we negotiate prices with the sales reps from the different fertilizer companies.

Q: And was this situation or practice specific to you, or is this the standard in the industry for companies that sell fertilizers?

A: Pretty much standard in the industry.

Q: And why is it that it has to work this way?

A: A lot of things happen on a very fast track. You can have a customer come in and wanting [sic] a quote on

278

certain type of fertilizer for whatever the immediate shipment, and most of the time it's done on a phone call. . . .

Q: You heard Mr. Ralston also testify that at times adjustments have to be made or changes in the agreement. Is that true?

A: Yes, it is.

¶ 28. This testimony is also relevant to the third factor that supports the finding of an oral modification —the parties' long-standing relationship. Olsen testified at trial that Olsen's Mill had been conducting business with Royster for more than 40 years. Furthermore, Olsen and Ralston both testified to the fact that the two men had been dealing with one another for 18 years. Wisconsin Stat. 401.205(1) defines a course of dealing as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Wis. Stat. § 401.205(1). While not conclusive on this point, the long-standing relationship between both the individuals and the companies supported a strong inference that the circuit court could use in finding that strict formalities concerning contracts and modifications were not always followed. This inference is also buttressed by Olsen's testimony that contracts and modifications thereof are frequently oral in the fertilizer industry.

¶ 29. When Ralston was asked "Is it safe to say this is one of the first times that you have made representations to your customers that your company did not back you on?" he responded "I think it was the only time." This statement supported the testimony of Olsen that an agreement was reached to modify the

contract. It is also inconsistent with Rainey's testimony that no assurances were made.

¶ 30. Fourth, conduct by both of the parties evidences a course of performance at variance with the terms of the written contract. "The code itself recognizes the relevance of conduct." *Christensen,* 134 Wis. 2d at 304. Wisconsin Stat. § 402.208 "provides that a course of performance inconsistent with any terms of an agreement shall be 'relevant to show a waiver or modification' of that term." *Id.* (quoting Wis. Stat. § 402.208(3)). Therefore, if Royster or Olsen's Mill acted in a manner inconsistent with the terms called for in the written agreement, the circuit court certainly could infer from those inconsistent actions that a modification took place.[12]

¶ 31. Olsen and Ralston both testified that in mid-June 2001, Olsen sought a buyout or a refund from Royster on the yet undelivered 1300 tons of nitrogen fertilizer. After discussions with Ralston, Olsen agreed to retract its buyout request, take all of Royster's remaining nitrogen fertilizer—in an amount exceeding that in its original contract—and sell it at a loss. It is difficult to believe that Olsen would have accepted not only the amount of fertilizer contracted for and prepaid, but in addition to that, 34.6 additional tons, which would be sold at a loss, if there had not been an oral agreement to modify the contract. It is reasonable to draw the inference that Royster would expect Olsen's Mill to agree to such terms only if incentives had been given in return.

---

[12] *See also id.; Etheridge Oil Co. v. Panciera,* 818 F.Supp. 480, 483 (D. RI, 1993)("North Carolina courts have recognized that the intent of [UCC § 2–209(4)] is to give legal effect to the parties' actual later conduct." (citation omitted)).

¶ 32. Finally, the circuit court found that there was evidence in the record of a lack of good faith on Royster's part in its dealings with Olsen's Mill. Regarding the mid-June conversation between Ralston and Olsen about the possibility of terminating the nitrogen contract, Ralston was asked the following question: "And also when Olsen's Mill talked to you about the rebates or getting the money, do I understand the response from Royster-Clark through you [Ralston] was, [w]e have your money, we have your product, and we are not giving back your money?" Ralston responded "That's right."

¶ 33. Olsen's testimony confirmed this conversation. Question: "What type of agreement or representations did Roger [Ralston] make in terms of modifying this contract?" Olsen answered: "We asked if there was going to be concession (sic) or we could buy out of the contract or cancel a contract, and Roger virtually pleaded with us, as he's testified, [w]e have the money; we have the product." As the circuit court noted, if Olsen had unilaterally rescinded the contract, Royster would have a duty to mitigate. *See* Wis. Stat. §§ 402.708(1) and 402.709(1)(b). Neither the contract nor the UCC would have entitled Royster to retain both product and payment.

¶ 34. Furthermore, the circuit court did not find the testimony of Rainey to be credible, as he testified to matters outside the scope of his firsthand knowledge, and because his testimony directly contradicted the testimony of both Olsen and Ralston. The circuit court inferred from this a lack of good faith on the part of Royster.[13]

[13] *See also Allapattah Servs. Inc. v. Exxon Corp.,* 61 F.Supp.2d 1308, 1319 (SD FL 1999)("The duty of good faith is

¶ 35. Olsen's testimony then continued:

He wanted us to make sure we took the product and we had some negotiation, talking, and at that time it was still raining and we made—I should say I believe I had an agreement with Roger—we put three of our bins of trucks on and hauled product from East Dubuque [Royster's plant], and he was going to inform us if the price went down. My commitment to him was I would take and move that product to the farmer and personally at this time it was going to simply be going out on ground through your agent's systems, and whatever price it was from what we purchased it to what we sold it to the farmer, was what he was going to try to get a credit when we refilled in the fall of either material or price concession on the number of times we bought –

THE COURT: Now, let me—Could you cover that one more time? I just want to—All right. You agreed to put on three trucks to get the product out of there, and in return for that Roger did what?

A: He was going to work to either give us free product or reduce the price per ton of product we would have purchased in our fall fill. . . .

Q: I think also the Court's asking what was your agreement with the owner, with the property owners, the farmers?

A: Well, we went out and our goal was to move Roger's product, and the commitment and whatever the price was—Let's say that the price at the farm was $140 a ton. We would sell it at the farm for 140 bucks, and the price difference between the $140 and $192 or $52 a ton was the difference. I told Roger then you have to make

especially applicable in situations when the contract confers one party with the discretion to determine certain terms of a contract, such as an open price term agreed to be unilaterally set." (citations omitted)).

ten cents on the product. I would haul it and eat this cost, which is about $20 a ton, but I didn't want to lose a penny on the nitrogen so I didn't make a margin, but we needed to work through this, and that's what we did.

Based on Olsen's testimony, the circuit court's finding of fact that there had been a valid oral modification of the contract cannot be said to be clearly erroneous. *See Gerner v. Vasby,* 75 Wis. 2d 660, 664, 250 N.W.2d 319 (1977).

¶ 36. The court of appeals made much of Olsen's statement that "He [Ralston] was going to work to either give us free product or reduce the price per ton of product we would have purchased in our fall fill." Although Olsen's statement does not unambiguously reference a completed deal, there certainly is no difficulty in reading this statement as a reflection of Olsen's understanding that, although the particulars of the concessions had not been finalized, Ralston had agreed to do something for Olsen in regard to one of the two alternatives. It appears to be self-evident that a contract may legitimately allow its terms to be met by fulfilling either of two alternative terms. *See* Wis. Stat. § 402.201(1); Official Comment 3, Wis. Stat. Ann. § 402.201 (West 2003). "[S]uch material terms as are stated need not be precisely stated." Official Comment 3, Wis. Stat. Ann. § 402.201 (West 2003).[14] The fact of this alternative provision is further buttressed by Olsen's next statement: "I told Roger then you have to make ten cents on the product. I would haul it and eat this cost, which is about $20 a ton, but I didn't want to lose a penny on the nitrogen so I didn't make a margin,

---

[14] *See also id.,* discussing the duty of good faith in relation to an open price term which the parties agreed could be set unilaterally.

but we needed to work through this, and that's what we did." The attempt at modification here operated as a waiver in accord with Wis. Stat. § 402.209(4), even though the requirement of sub. 2 that the modification must be in writing was not satisfied.

**B**

¶ 37. The second exception to the statute of frauds writing requirement is performance of the terms of the contract. Wisconsin Stat. § 402.201(3) provides, in relevant part, that "[a] contract which does not satisfy the requirements of sub. (1) but which is valid in other respects is enforceable·... [w]ith respect to goods for which payment has been made and accepted or which have been received and accepted. . . ." Wis. Stat. § 402.201(3).

¶ 38. It is undisputed that the nitrogen contract between Royster and Olsen's Mill was prepaid in full on January 29, 2001. Both parties also acknowledge that, before the disputed mid-June 2001 oral modification, Royster had delivered approximately 700 tons of nitrogen fertilizer to Olsen's Mill. Although Olsen's Mill prepaid the original nitrogen contract in full, it did not pay Royster for the additional 34.6 tons of fertilizer it agreed to buy as a result of the mid-June 2001 discussions. Therefore, the modification cannot evade the statute of frauds requirement based upon the exception with regard to "goods for which payment has been made and accepted. . . ." Wis. Stat. § 402.201(3)(c). Performance, however, encompasses more than prepayment. Because the original contract had been paid in full, but only delivered in part, the modified contract was partly performed.

¶ 39. Two Wisconsin cases have analyzed the performance exception to the statute of frauds. The first is *Hilkert v. Zimmer,* in which this court considered the efficacy of an oral variation to a written contract, and the effect of full performance. *Hilkert v. Zimmer,* 90 Wis. 2d 340, 343, 280 N.W.2d 116 (1979). The *Hilkert* court reasoned that an oral modification to a written contract is not invalid per se. "Even where it is clear as a matter of law that an oral variation to a written contract is within the strictures of the statute of frauds, the oral contract may be enforceable in equity under Wisconsin law." *Id.* In *Hilkert,* however, the contract had been fully performed, so the court did not need to consider an equitable resolution, because "the fully performed contract is completely beyond the scope and operation of the statute of frauds. . . ." *Id.*

¶ 40. Regardless of the fact that the disputed modification in this case was not fully performed, *Hilkert* is still relevant to the resolution of this case. *Hilkert* stands for the proposition that the statute of frauds does not automatically negate an oral modification and that such a modification may be enforceable in equity.

¶ 41. Even though the parties had not fully performed the modified contract, part performance had occurred. Part performance under Wis. Stat. § 402.201(3)(c) occurs when a buyer accepts the product and the seller participates in, or expresses assent to, the change in possession and control of the product. *See Gerner,* 75 Wis. 2d at 667–68. In *Gerner,* this court examined the parameters of this performance exception. *Gerner* involved a dispute between a buyer and a seller of 10,000 bushels of corn, as to whether an enforceable contract with respect to the price per bushel had been made. The issue in that case was "whether a telephone conversation between Gerner and Vasby on April 4,

1973, constituted an oral contract which would be enforceable but for its failure to comply with the statute of frauds." *Id.* at 661.

¶ 42. The *Gerner* court acknowledged that Wis. Stat. § 402.201(3) delineates "what part performance will be sufficient to make enforceable an oral contract not in compliance with the statute of frauds. . . ." *Id.* at 666. As Gerner had delivered the corn in approximately the quantity called for in the oral contract, and Vasby had accepted and tendered payment for the corn, the court had to determine whether this constituted part performance pursuant to the statute. *Id.*

¶ 43. Concluding that performance was not unilateral, as Gerner had delivered and Vasby had accepted the corn, this court upheld the decision of the circuit court that there was part performance consistent with Wis. Stat. § 402.201(3). *Id.* at 667. Such part performance "made the contract enforceable even though it did not satisfy the 'writing' requirements of sub. (1) of sec. 402.201, Stats., the statute of frauds." *Id.* at 670. Because the circuit court concluded that Vasby's testimony was the more credible of the two, it was able to determine that a valid contract had been created, despite failing the statute of frauds requirement.

> It seems clear, therefore, that, in circumstances such as this, where the conduct which is relied upon for part performance is consistent with the contract, such conduct is sufficient to take the contract out of the statute of frauds even though such conduct is not inconsistent with some other dealings arguably had between the parties.

*Id.*[15]

---

[15] *See also Fendley v. Dozier Hardware Co., Inc.*, 449 So.2d 1236 (Ala. 1984):

¶ 44. The facts of this case fall within this part performance exception. Olsen's Mill sought a buyout of the undelivered portion of its original nitrogen contract. After discussions with Ralston, Olsen's Mill retracted the request and accepted not only the balance of the product pursuant to the contract, but an additional 34.6 tons of nitrogen fertilizer. Assent by Royster is found in that it allowed Olsen's Mill to come to Royster's plant and load its trucks with the additional 34.6 tons.

¶ 45. Royster contends *Hilkert* and *Gerner* are factually distinguishable, and therefore, inapplicable to the case at bar. We disagree. Although both *Hilkert* and *Gerner* present different facts than this case, the legal principles regarding the creation and modification of oral contracts are applicable to facts present here.

¶ 46. We, therefore, conclude that the actions of both Royster and Olsen's Mill comprise part performance of the disputed modification of the nitrogen contract sufficient to take it out of the statute of frauds. Because we conclude that the dealing between the parties meets the performance exception to the statute of frauds, a written modification was not necessary to execute an enforceable modification of the nitrogen contract.

C

¶ 47. We are satisfied, after considering the totality of the circumstances, as did the circuit court, exam-

Under [UCC § 2–201], no writing is required with respect to goods which have been received or accepted. The official comment to [§ 2-201] includes the following statement pertaining to partial performance: "Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists."

*Id.* at 1239.

ining the entire record, and giving deference to the credibility determinations of the circuit court, that the finding that Royster and Olsen's Mill had agreed to an oral modification of the nitrogen contract is not clearly erroneous.

¶ 48. Since we agree with the circuit court's finding that the nitrogen contract was orally modified, we further hold, as did the circuit court, that Royster owed Olsen's Mill a rebate on the prepaid contract. Since a rebate was due in an amount in excess of the $50,472.31, stipulated to as owed by Olsen's Mill on the Super Rainbow contract, and since the amount due to Olsen's Mill was found to be $28,721.69, Royster has no basis upon which it may claim interest due for late payment on the Super Rainbow contract.

IV

¶ 49. We reverse the decision of the court of appeals. Doing so, we hold that the circuit court's finding of fact regarding the oral modification of the nitrogen contract was not clearly erroneous, as there was sufficient evidence in the record from which the circuit court could reasonably find that a valid oral modification had occurred. Because we determine that the circuit court's finding of an oral modification was not clearly erroneous, and because we determine that the circuit court was legally correct in its conclusion that Olsen's Mill was entitled to a setoff against the money it owed Royster on the second contract, we are satisfied that Royster has no basis for its claim of interest due.

*By the Court.* — The decision of the court of appeals is reversed, and the matter is remanded to the circuit court in order to reinstate its judgment.

¶ 50. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I agree with the majority opinion and the opin-

ion of the court of appeals that an oral modification of a written agreement may be valid if one of the exceptions to the writing requirement is met.

¶ 51. Whether there was an attempt at modification under Wis. Stat. § 402.209 to operate as a waiver of the statute of frauds or whether there was part performance under Wis. Stat. § 402.201(3)(c) sufficient to satisfy the statute of frauds, a party claiming an oral modification cannot succeed unless it proves that the parties agreed to an oral modification.

¶ 52. The court of appeals got it right; the circuit court's finding of an oral modification of the contract is clearly erroneous. I do not agree with the majority opinion that the circuit court's finding of an oral modification of the price terms of the original written contract was not clearly erroneous, that is, that the circuit court's finding of an oral modification of the contract is not against the great weight and clear preponderance of the evidence.[1]

¶ 53. The majority opinion's review of the evidence to support a valid oral modification of the contract is no more persuasive than the circuit court's. Because the finding of an oral modification of the price terms of the original written contract is clearly erroneous, there cannot have been waiver by an attempt to modify orally the written contract. Further, even if the part performance exception to the writing requirement has been met, the

---

[1] *Robertson-Ryan & Assocs. v. Pohlhammer,* 112 Wis. 2d 583, 592, n.*, 334 N.W.2d 246 (1983) (Abrahamson, J., dissenting) (under Wis. Stat. § 805.17(2) (2003–04) the "clearly erroneous" test applicable to the findings of fact of a circuit judge sitting without a jury is the same as the "against the great weight and clear preponderance of the evidence" test); *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340 N.W.2d 575 (Ct. App. 1983) (same).

record conclusively shows that there was no oral modification to the price terms of the original contract.

## I

¶ 54. I agree with the majority opinion that a waiver of the statute of frauds is closely related to the inquiry whether a valid oral modification exists.[2]

¶ 55. The record does not support a finding that an oral modification was made. The testimony of Roger Ralston and Paul Olsen was consistent: Ralston told Olsen that if Olsen increased the quantity of his purchase, Ralston would work to modify the original contract regarding price, not that the original contract was hereby modified between the parties.[3] Olsen testified that Ralston said he was going to work "to either give us free product or reduce the price per ton." Ralston needed corporate approval from Royster-Clark before the contract could be modified. This testimony should end this case in favor of Royster-Clark, as the court of appeals held.

¶ 56. Nevertheless, the circuit court found that Ralston had apparent authority to bind his principal (Royster-Clark) to an oral modification regarding price. Apparent authority is generally a question of fact. Apparent authority results from the conduct of the principal (here Royster-Clark) that causes a third person (here Olsen's Mill) to reasonably believe that the agent (here Ralston) has authority to act (here to modify the contract).[4]

---

[2] Majority op., ¶ 22.

[3] *Id.*, ¶ 35.

[4] *Iowa Nat'l Mut. Ins. Co. v. Backens,* 51 Wis. 2d 26, 33–34, 186 N.W.2d 196 (1971); *Ivers & Pond Piano Co. v. Peckham,* 29

¶ 57. The circuit court's finding of apparent authority (affirmed by the majority opinion) to modify the original contract without approval by Royster-Clark is not supported by the record.

¶ 58. The majority opinion and circuit court apparently infer from Royster-Clark's having previously gone along with Ralston's proposed contract modifications that either Royster-Clark's approval was not really necessary or that Royster-Clark's approval of any modification was automatic and that Olsen's Mill could therefore act with the assurance that Royster-Clark would approve any modifications Ralston proposed. None of these inferences is supported by the record.

¶ 59. The majority opinion relies on the parties' course of conduct to override Ralston's and Olsen's testimony that Ralston needed corporate (Royster-Clark's) approval of a modification of the contract. Course of conduct, sometimes referred to as custom, is a factor that may support the presence of apparent authority.

¶ 60. Yet the course of conduct in the instant case supports the conclusion that Royster-Clark's approval was required for any modification, that Royster-Clark did not always approve Ralston's proposed modifica-

Wis. 2d 364, 139 N.W.2d 57 (1966); *Wis. Cent. Ry. Co. v. Phoenix Ins. Co.,* 123 Wis. 313, 101 N.W. 703 (1904).

The Wisconsin cases adopt 1 Restatement of Agency § 8 (1933), relating to apparent authority. These cases are still good law in this state. For similar statements about apparent authority, see 1 Restatement of Agency 2d § 8 (1957); 1 Restatement of Agency 3d § 2.03 (Tent. Draft No. 2 2006); Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership* § 23, at 57–64 (2d ed. 1990); 1 Floyd A. Meechem, *A Treatise on the Law of Agency* §§ 720–26, at 5081–83 (1914); and Warren A. Seavey, *Law of Agency* § 22, at 43–45 (1964).

tions, that Royster-Clark never expressly or impliedly waived the approval requirement, and that Olsen's Mill could not reasonably have relied on Royster-Clark's automatically approving Ralston's proposals.

¶ 61. Ralston answered affirmatively, as the majority opinion states, on cross-examination by Olsen's Mill's attorney that it was "safe to say this is one of the first times that [he] made representations to [his] customers that [his] company did not back [him] on."[5] However, Ralston's entire testimony at that point in the questioning makes clear that Ralston attempted to negotiate with Royster-Clark on behalf of his customers, that he did not always get what he wanted for his customers, and that Olsen's Mill would have every reason to expect him to "try" to get some type of rebate. Ralston's examination was as follows:

Q. Is it safe to say that this is one of the first times that you have made representations to your customers that your company did not back you on?

A. I think it was the only time.

Q. And I believe you testified that over the years numerous times you would go back on behalf of your customers and try to make things right for them and for your company?

A. It was an effort in every negotiation, yes.

Q. And it was something that Olsen's Mill had done with you numerous times again over the years?

A. Yes.

Q. And would have every reason to believe that you were in fact going to try to get them or would get them some type of rebate considering the situation everybody was in?

[5] Majority op., ¶ 28.

A. I think they knew I was going to try.

Q. And you'd always been successful before, correct?

A. No. I didn't get—I haven't always gotten everything I wanted—

Q. But for the most part?

A. —but I always tried.

¶ 62. In addition, Olsen's examination shows that he knew that Ralston could not bind Royster-Clark on the modified contract price and that Ralston had to seek approval. Olsen testified as follows:

> [Ralston] wanted us to make sure we took the product and we had some negotiation, talking, and at that time it was still raining and we made—I should say I believe I had an agreement with [Ralston]—we put three of our bins of trucks on and hauled product from [Royster's plant], and *he was going to inform us if the price went down.* . . . [W]hatever price it was from what we purchased it to what we sold it to the farmer, was what he was going *to try to get a credit* . . . . He was going *to work to either give us free product or reduce the price per ton of product we would have purchased* in our fall fill. . . . (Emphasis added.)

¶ 63. Olsen's testimony is clear. He agreed to take more products, Ralston agreed to seek two possible concessions and then inform Olsen which, if either, of these concessions was granted.

¶ 64. This record shows a course of conduct that Ralston needed to get corporate approval for any modification of a written contract and Olsen's Mill knew of Ralston's need to get corporate approval. Accordingly, the circuit court's finding that the parties orally modified the original contract was clearly erroneous.

293

¶ 65. I also agree with the majority opinion that part performance may satisfy the statute of frauds. *See* Wis. Stat. § 402.201(3)(c). Part performance may be made by payment and acceptance of such payment or by receipt and acceptance of the goods. *Id.* The majority is correct that the contract modification was partially performed because there was receipt and acceptance of the 34.6 tons of nitrogen fertilizer.

¶ 66. This part performance exception to the writing requirement cannot be used in the present case to support any conclusion about the content of the oral contract. Section 402.201(3)(c) states that "[a] contract which does not satisfy the requirements of sub. (1) [namely a writing] *but which is valid in other respects* is enforceable: . . . [w]ith respect to goods . . . which have been received and accepted" (emphasis added). In other words, part performance can be used to establish the existence of a contract, even one that should have been in writing. The parties may then prove the terms of that oral contract by oral testimony.

¶ 67. As I have already discussed, the content of the oral contract claimed by Olsen's Mill did not include a promise by Royster-Clark to rebate the price of the 2,000 tons of nitrogen fertilizer from the original contract. On the contrary, the testimony is unequivocal that Ralston would only try to get a rebate; that he did not have authority to modify the price of the original contract; and that he had to get approval from somebody else at Royster-Clark for any modification.

¶ 68. I conclude that part performance of the oral contract for 34.6 tons, and part performance of the original contract, though taking into account any oral agreement outside the writing requirement, do not, on

this record, support a finding of an oral change in the price terms of the original written contract.

¶ 69. Because the circuit court was clearly erroneous in determining that there was an oral agreement to change the price terms of the original written contract, I dissent.

¶ 70. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

¶ 71. DAVID T. PROSSER, J. (*dissenting*). Chapter 402 of the Wisconsin Statutes creates a regulatory framework for commercial sales transactions in Wisconsin. The chapter is Wisconsin's codification of Article 2 of the Uniform Commercial Code (UCC).

¶ 72. Section 402.201(1) embodies Article 2's statute of frauds. It reads in part: "[A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Wis. Stat. § 402.201(1).

¶ 73. Section 402.209 addresses "Modification, rescission and waiver." Subsection (2) reinforces § 402.201(1): "A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded." Wis. Stat. § 402.209(2). Subsection (3) adds: "The requirements of § 402.201 must be satisfied if the contract as modified is within its provisions." Wis. Stat. § 402.209(3).

¶ 74. These provisions establish the basic "rule" about written sales contracts. As indicated, parties are entitled to supplement the basic rule with specific contractual language prohibiting modifications that are not in writing. Wis. Stat. § 402.209(2).

295

¶ 75. ' The "PREPAY SALES AGREEMENT" for nitrogen fertilizer between Royster-Clark and Olsen's Mill states that "this contract shall be governed by and interpreted pursuant to the provisions of the Uniform Commercial Code." The contract also provides that "[n]o additional or different terms shall be binding on seller unless specifically accepted by seller in writing."

¶ 76. Royster-Clark maintains that both Chapter 402 and the contract itself *require* that any modifications to the nitrogen contract be in writing before they are binding upon Royster-Clark.

¶ 77. Olsen's Mill acknowledges the applicability of the UCC to the contractual agreement. However, it emphasizes that there are recognized exceptions to the UCC's statute of frauds and to contractual no oral modification clauses.

¶ 78. In particular, subsection (4) of § 402.209 creates a waiver exception: "Although an attempt at modification or rescission does not satisfy the requirements of sub. (2) or (3) it can operate as a waiver." Wis. Stat. § 402.209(4).

¶ 79. Subsection (5) then provides: "A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver." Wis. Stat. § 402.209(5).

¶ 80. The meaning of the waiver language in Wis. Stat. § 402.209 was carefully considered in *Wisconsin Knife Works v. National Metal Crafters,* 781 F.2d 1280 (7th Cir. 1986) (rehearing and rehearing en banc denied Feb. 19, 1986). The majority opinion, written by Judge Richard Posner, held that an attempted oral modifica-

tion of a written contract that precludes modifications except in writing operates as a waiver only if there is reliance on the attempted modification. Judge Posner's discussion is exceptionally helpful in putting the provisions of § 402.209 in context. *Wis. Knife Works*, 781 F.2d at 1286–87.

¶ 81. Judge Posner acknowledged that not all decisions and commentators insist that reliance is a necessary condition of an unwritten waiver. For instance, he quoted Hawkland, "if clear factual evidence other than mere parol points to that conclusion [that an oral agreement was made altering a term of the contract], a waiver may be found. In the normal case, however, courts should be careful not to allow the protective features of sections 2–209(2) and (3) to be nullified by contested parol evidence." *Id.* at 1287 (quoting 2 Hawkland, *Uniform Commercial Code Series* § 2–209:05 at 138 (1985)).

¶ 82. Judge Frank Easterbrook dissented. He explained: " 'Waiver' is not a term the UCC defines. At common law waiver means an intentional relinquishment of a known right. A person may relinquish a right by engaging in conduct inconsistent with the right or by a verbal or written declaration." *Id.* at 1290 (Easterbrook, J., dissenting).

¶ 83. The legal issue presented in this case is whether the acts of Royster-Clark in the circumstances before us constitute a valid waiver under § 402.209(4). Regardless of how this court might choose to interpret § 402.209(4), we must do our best to maintain the integrity and uniformity of the UCC in applying the law.

¶ 84. In essence, Olsen's Mill contends that Royster-Clark waived two critical provisions of the nitrogen fertilizer contract. First, it allegedly waived

297

the "no modification except in writing" provision. Second, it allegedly waived the price provision, so as to allow Olsen's Mill a rebate or a credit on future purchases.

¶ 85. To recap: The parties entered into a written contract for the sale to Olsen's Mill of 2000 tons of nitrogen fertilizer. The price agreed upon was $384,000. Olsen's Mill paid the $384,000 to Royster-Clark before obtaining a single pound of fertilizer under the contract.

¶ 86. Paul Olsen testified that Olsen's Mill had been doing business with Royster-Clark since the early 1960s and that he had worked with Roger Ralston in different capacities for 18 years. During most of this relationship between Royster-Clark and Olsen's Mill, their agreements had been "verbal." This practice continued with an oral agreement in mid-May 2001 to purchase an additional batch (about 300 tons) of "Super Rainbow" fertilizer.

¶ 87. With respect to the nitrogen fertilizer contract, Olsen testified that Olsen's Mill intended to purchase 500 tons on a prepay agreement in January 2001 but Roger Ralston "asked if we would purchase the total lot of 2000 ton from him. . . . [I]n order to [re]start the plant and get product, he needed to sell the 2000 ton, so we agreed to purchase 2000 ton of product so we had it for sale to our customers."

¶ 88. Robert Rainey acknowledged that "[w]e did have a plant shut down from . . . about the middle of December I think until around the end of January."

¶ 89. Olsen testified in response to questions:

Q: When did you actually need this [nitrogen] product?

298

A: We needed the product very shortly. Royster-Clark wasn't producing any product and the plant wasn't running at the time of this agreement and we were selling product.

. . . .

Q: So was the product available in February or March or even April?

A: No. We went out and purchased an additional 1000 ton . . . off of the Illinois River, and that was trucked up during the months of February-March to fill ours.

Q: So . . . Royster-Clark was not able to fulfill the contract earlier in the year as you requested?

A: Correct. Roger — We knew when Roger came to us, he was getting spread pretty thin and he didn't want us to pull it all at one time. He was trying to spread his inventory production out to take care of as many people as he could.

¶ 90. Ralston testified that Olsen's Mill was "concerned in April; I know that." He confirmed that in April, the demand for the nitrogen product was greater than the supply.

¶ 91. Olsen's Mill made the first pickup of the nitrogen product on May 17, 2001. No doubt, some of the delay resulted from a precipitous change in the weather. As Olsen testified, "We had a very good April until the 28th of April when it started to rain for 40 days."

¶ 92. About the middle of June, Olsen talked to Ralston about the situation and told him that a lot of farmers had decided not to plant crops because of the bad weather. By this time, supply of the nitrogen product had gone up, while the price and demand for

the product had plummeted. Olsen asked Ralston for price concessions, or to allow Olsen's Mill to buy out the contract, or to cancel the contract. Ralston, however, pleaded with Olsen to take the full 2000 tons.

¶ 93. There is no dispute that "concessions on the nitrogen contract were discussed." Majority op., ¶ 6. It is also true that Olsen's Mill did not pursue the option of a buyout. Instead, it accepted delivery of the remaining 1300 tons on the contract, and even more.

¶ 94. It is entirely reasonable to believe that Olsen's Mill *expected* some significant price concessions on the nitrogen contract because of the longstanding relationship and course of dealing with Royster-Clark; the fact that it ordered more product than originally intended at the request of Royster-Clark; the fact that it prepaid $384,000 for the product; the fact that Royster-Clark failed to timely perform the contract; the fact that Royster-Clark's failure of performance required Olsen's Mill to go out and buy 1000 tons of nitrogen fertilizer from another vendor; the fact that Ralston had negotiated a mutually beneficial *oral* contract for Super Rainbow less than a month before the talk of concessions; the willingness of Olsen's Mill to make accommodations with Royster-Clark in not *demanding* nitrogen product in March and April when the supply was short; and the usage of trade in the industry. It is reasonable to believe that Olsen's Mill acted on this expectation.

¶ 95. There is not much evidence, however, that Roger Ralston made a *commitment* to modify the price on the written contract, or that Ralston would have had authority to do so. Even Olsen's testimony as to a firm "promise" is equivocal.

¶ 96. There is no evidence that Olsen's Mill took an additional 34.6 tons *in return for a price concession* on the January contract.

300

¶ 97. Olsen's Mill's responsibility to pick up product and bear shipping costs from East Dubuque was anticipated in the contract. Consequently, the timing of the pickups was entirely the responsibility of Olsen's Mill once the nitrogen product became available.

¶ 98. The Super Rainbow contract was negotiated separately about a month before the discussion of concessions, so that it was not a direct factor.

¶ 99. In other words, Olsen's Mill abandoned the option of trying to buy out the contract and accepted the product on a mere promise that Ralston would try to obtain price concessions. These facts do not demonstrate an induced *reliance* in June 2001 by Olsen's Mill. These facts do not establish an intentional relinquishment of a known right by Royster-Clark. There is no "clear factual evidence" of an attempted modification by the *two* parties.

¶ 100. Much as I am tempted to rely on historical course of dealing and trade usage, I do not see these factors overcoming the strict terms of the contract. *See* Wis. Stat. § 402.208(3).

¶ 101. My vote to affirm the court of appeals does not signal my approval of Royster-Clark. On the contrary, in my view, Royster-Clark breached the contract by failing to make the nitrogen product timely available for Olsen's Mill to pick up, thereby causing real hardship to a good and faithful customer. Unfortunately, the question of breach is not the question before us.