COURT OF APPEALS
DECISION
DATED AND FILED

June 18, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP1002**

STATE OF WISCONSIN

Cir. Ct. No. **2025CV44**

IN COURT OF APPEALS
DISTRICT IV

---

CASSI MARIE KRUGER,

    PETITIONER-RESPONDENT,

V.

CYNTHIA M. WEBER,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Marquette County: CHAD A. HENDEE, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Cynthia Weber appeals a harassment injunction prohibiting her from contacting Cassi Kruger and from being present at any

premises temporarily occupied by Kruger, including Kruger's children's sporting events, for four years. We conclude that Kruger met her burden to show that the injunction is warranted under WIS. STAT. § 813.125 (2023-24),[1] and that Weber has not demonstrated any basis for reversing the circuit court's order granting the injunction. Accordingly, we affirm.

## BACKGROUND

¶2 In April 2025, Kruger filed a petition for a restraining order against Weber, her former mother-in-law and the grandmother of Kruger's children. At a hearing on the petition, Kruger testified as follows. Weber's harassing conduct began in May 2023, when Weber attended Kruger's oldest son's baseball practice. Grandparents and other spectators generally did not attend practices, and Weber had attended few of Kruger's children's sporting events before. At the practice, Weber's phone was "always … pointed in the direction of [Kruger and her husband]," leading Kruger to believe that Weber was making unconsented recordings of her. Weber continued to attend the children's baseball events during the 2023 season, moving to wherever Kruger was on the field and seeming to take photos and videos of her. Weber would "come right in the dugout in front of the children, [and] get her phone in [Kruger's] face."

¶3 In March 2024, Weber sat in front of Kruger at Kruger's children's wrestling meet. Weber "kept turning around with her phone," seeming to take photos of Kruger. When Kruger and her husband moved away from the wrestling mats, Weber moved to sit directly across from them, continuing "to have her

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

phone up" and appearing to record Kruger and her husband at a time when Kruger's children were not in the gym. After this incident, feeling "scared" and "anxious," Kruger sent Weber a message asking Weber to "[p]lease stop photographing and recording" Kruger. Weber responded, stating that "those were false accusations."

¶4      Weber continued this conduct during the 2024 baseball season. At one game, Weber entered the opposing team's dugout in order to seemingly record Kruger when Kruger was coaching third base. Kruger testified that she became "terrified" by Weber following her and seeming to record or photograph her for no discernable reason. Weber did not speak to Kruger, except when Kruger "would verbally ask her to stop, [and Weber] would call [Kruger] a liar."

¶5      Kruger also testified about Weber's online activity. Despite Kruger blocking Weber on several social media platforms, Kruger received notifications that Weber continued to view Kruger's social media accounts from accounts that Kruger believed belonged to Weber. In November 2024, Kruger's eleven-year-old son informed Kruger that in Weber's residence, Weber "ha[d] a stack of papers and photographs" of Kruger and her husband, which Weber had "printed out of [Kruger's and her husband's] social media accounts."

¶6      The latest incident about which Kruger testified was her children's state wrestling tournament in March 2025. While Kruger and her family were away from their seats getting some refreshments, Weber and her son moved into the seats that Kruger and her family had been sitting in. After a discussion, Kruger went into the hallway and then went back into the event and sat in a different area. Eventually, Kruger returned to where she had originally been sitting to collect her things. She told Weber that what Weber was doing was

"really disrespectful," before Kruger went back to the new seat that she had found. After a few minutes, Weber went over to where Kruger was, "screaming [Kruger's] name." Kruger tried to walk away from Weber, but Weber "chased" her, "still screaming" for Kruger to get back and for others to get out of her way. Weber "shoved" Kruger's father before "standing over" and "yelling at" Kruger's mother.

¶7 Weber also testified at the hearing. She testified that she intentionally took one photo of Kruger for use in her son's divorce case, but she denied that she ever intentionally took other videos or photos of Kruger. Weber denied that she ever followed Kruger with her phone, testifying that she intended to take images of only her grandchildren at their sporting events.

¶8 With respect to social media, Weber acknowledged that she "earlier checked in Linked In for court documentation" and that some of the screenshots of accounts that Kruger had introduced were Weber's accounts, but Weber did not recall other activity. Weber further testified that she downloaded some photos of her grandchildren from Kruger's social media accounts.

¶9 Regarding the March 2025 wrestling tournament incident, Weber testified that she went to Kruger after the seating dispute to have a conversation, and that Weber did not scream. Weber also testified that she "saw [Kruger's] dad videotaping [the incident]" and she "did poke him in the back," asking him "[W]here was your video camera when your daughter was verbally attacking me[?]" Weber further testified that she was "frustrated at the situation of trying to enjoy the grandchildren and being falsely accused again." On cross-examination, Weber testified that she did not "recall ever being in the dugout" at her grandchildren's baseball games.

4

¶10     Kruger brought multiple witnesses to the hearing, but the circuit court's schedule allowed for her to call only one, Ashley Podoll, who coached Kruger's younger son in baseball and saw Weber at the son's baseball games. Podoll testified that she saw "concerning behavior" from Weber "many times," including at baseball games, which caused Podoll to ask Weber "to please not be in the dugout." Podoll observed Weber following Kruger and Kruger's husband around and seeming to record or photograph them on multiple occasions, and testified that Weber "was … purposely moving around to take certain videos around the field, ending up in the opposing team's dugout," which was conduct that "did not really make sense if you were just there watching your … grandchildren."

¶11     After the close of evidence, the circuit court made findings that included the following, which the court concluded as a totality supported its decision to grant the injunction. "[I]n the grand scheme of credibility here, the Court finds Ms. Kruger more credible [than Weber] as to what actually happened here." The court found that Weber "may have not" had "an actual intent to somehow harm or otherwise stalk Ms. Kruger," but at the same time the court said that it was satisfied that "Weber engaged in a course of conduct … that did harass or intimidate Ms. Kruger and did not serve legitimate purposes." The court also found that Weber acted "with intent to harass or intimidate Ms. Kruger" based on its determination that anyone "following a person around or taking repeated videos of another person," being "asked to stop and continu[ing] to do so realizes that their actions are [harassing or intimidating]." The court specifically credited Kruger's testimony that Weber repeatedly followed Kruger around at Kruger's children's sporting events, taking images of her. The court took the social media evidence into account, but "[t]o a lesser degree." Weber appeals.

**DISCUSSION**

¶12    Weber asserts that the circuit court "overreach[ed]" in granting the injunction because "the circuit court never found, and the record does not support, intent to harass" and because "Weber's conduct served a legitimate familial purpose."[2]

¶13    Pursuant to WIS. STAT. § 813.125(4)(a)3., an injunction may be granted if a circuit court finds "reasonable grounds to believe that the respondent has engaged in harassment with intent to harass or intimidate the petitioner." "Harassment" is defined, in pertinent part, as "[e]ngaging in a course of conduct or repeatedly committing acts which harass or intimidate another person and which serve no legitimate purpose." § 813.125(1)(am)4.b.

¶14    We review a circuit court's decision on whether to grant an injunction under a mixed standard of review. *Welytok v. Ziolkowski*, 2008 WI App 67, ¶23, 312 Wis. 2d 435, 752 N.W.2d 359. We accept the court's findings of fact unless they are clearly erroneous. *Id.* (citing WIS. STAT. § 805.17(2)). We independently review whether the petitioner has met the burden of proof to show that reasonable grounds for an injunction exist based on the established facts and the application of the statute to the facts. *Id.* At the same time, if the necessary conditions are satisfied, it is ultimately within a circuit court's discretion whether

---

[2] We note that Weber's appellate briefs do not comply with WIS. STAT. RULE 809.19(8)(bm), which addresses the pagination of appellate briefs. *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover"). We remind Weber's counsel that, as our supreme court explained when it amended the rule in 2021, the pagination requirement ensures that the numbers on each page of the brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of an electronically filed brief. S. Ct. Order 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021).

to grant an injunction and therefore we review that ultimate decision for an erroneous exercise of discretion. *Id.* "We may not overturn a discretionary determination that is demonstrably made and based upon the facts of record and the appropriate and applicable law," and "we generally look for reasons to sustain discretionary rulings." *Id.*, ¶24.

¶15 We begin with Weber's argument that the circuit court "did not find that Weber had the intent to harass or intimidate the Petitioner" as required by Wis. Stat. § 813.125(4)(a)3. This argument is belied by the transcript of the hearing on the petition. It is true that the court acknowledged the possibility that Weber may not have had "an actual intent *to somehow harm* or otherwise stalk Ms. Kruger." But the court also expressly determined that "there are reasonable grounds to believe that Ms. Weber has engaged in harassment *with intent to harass or intimidate* Ms. Kruger." (All emphasis added.) Intent, that is, the state of someone's mind, is a fact; we overturn the court's finding of intent only if it is clearly erroneous. *Welytok*, 312 Wis. 2d 435, ¶¶23, 26.

¶16 This brings us to the issue of whether the record supports the circuit court's finding that Weber acted with intent to harass or intimidate Kruger, even though her intent did not rise to the level of intending harm or of creating effects that could be expected of a full-scale stalking course of conduct. *See, e.g.*, *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530 (We "defer[] to the circuit court's findings of fact unless they are unsupported by the record and are, therefore, clearly erroneous."). Acting "with intent" includes acting with a purpose to do something or cause a specified result or acting with the knowledge that one's conduct "is practically certain to cause that result." *W.W.W. v. M.C.S.*, 185 Wis. 2d 468, 488-89, 518 N.W.2d 285 (Ct. App. 1984). By its very nature, intent is rarely proven by direct evidence. *Id.*

7

Instead, it "'must be inferred from the acts and statements of the person, in view of the surrounding circumstances.'" *Welytok*, 312 Wis. 2d 435, ¶26 (quoting *Pfeifer v. World Serv. Life Ins. Co.*, 121 Wis. 2d 567, 569, 360 N.W.2d 65 (Ct. App. 1984)).

¶17 Weber argues that there is no evidentiary support in the record for a finding of intent to harass. She relies heavily on her own testimony that she merely took "photographs of her grandchildren" and that any photographs she took of Kruger were unintentionally captured. She also notes that Kruger acknowledged that Weber "never touched" Kruger. However, the circuit court determined that Kruger was "more credible" than Weber "as to what actually happened." There was ample testimony from Kruger to support the factual findings that Weber repeatedly and without Kruger's consent and over her objections either took or pretended to take photographs of Kruger at Kruger's sons' sporting events, followed Kruger around baseball fields as Kruger coached in order to seemingly record Kruger, and engaged in the same type of conduct at wrestling meets. The court noted that Podoll corroborated some of that testimony. "When there is conflicting testimony, the circuit court is the ultimate arbiter of the witnesses' credibility," and we "defer to the circuit court's credibility determinations." *Welytok*, 312 Wis. 2d 435, ¶28. The court explicitly found that Weber understood that her conduct of following Kruger around and repeatedly taking or seeming to take videos of her, even after being asked to stop, was certain to make Kruger feel intimidated and harassed. *See W.W.W.*, 185 Wis. 2d at 488-89. That inference is reasonable, and it is not within the province of this court to reject it. *See Welytok*, 312 Wis. 2d 435, ¶27.

¶18 Weber contends that the circuit court "reli[ed] on [Kruger's] emotional testimony rather than evidence," which she asserts "is a clear

misapplication of WIS. STAT. § 813.125." This argument effectively ignores our standard of review, because it was generally for the circuit court to weigh which pieces of testimony were inaccurate expressions of emotion and which were accurate statements of fact. Further, Kruger's testimony is, of course, evidence. *See, e.g.*, WIS. STAT. §§ 904.01, 906.01. And beyond that, Kruger's reported feelings that she was being harassed and intimidated go directly to elements of § 813.125, and are therefore highly relevant if credited by the circuit court, as they were.

¶19 We now address Weber's argument that her conduct served a legitimate purpose of her simply participating in family activities, which took it outside the type of conduct that may be enjoined under WIS. STAT. § 813.125. Again here, Weber relies on her own testimony that she attended her grandchildren's sporting events with the completely legitimate purposes of supporting the children and taking family photos and videos. But the facts found by the circuit court, established primarily by Kruger's "more credible" testimony, support the finding that Weber's behavior diverged significantly from "ordinary grandparent behavior," as Weber contends. For example, Weber went into the opposing team's dugout to be able to seemingly record Kruger as Kruger coached third base while Weber's grandchildren were in their own dugout. Weber also recorded Kruger at wrestling matches when the children were not in the area. The circuit court had an ample record to determine that this conduct intimidated and harassed Kruger and did not serve a legitimate purpose. Weber has not demonstrated that an injunction is legally erroneous based on the legitimate purpose defense.

**CONCLUSION**

¶20    For all of these reasons, we affirm the circuit court's grant of the injunction.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.