COURT OF APPEALS
DECISION
DATED AND FILED

June 22, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP966**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019GN2

**IN COURT OF APPEALS
DISTRICT III**

---

IN THE MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF P. G.:

FLORENCE COUNTY,

   PETITIONER-RESPONDENT,

  V.

P. G.,

   RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Florence County: LEON D. STENZ, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  P.G. appeals orders establishing guardianships of his person and his estate, as well as an order for his protective placement.  P.G. argues the guardianship and protective placement orders must be reversed because the circuit court failed to find—and the evidence did not support a finding—that his needs could not be met through less restrictive means.  P.G. alternatively argues that the order establishing a guardianship of his estate must be reversed because he previously executed a financial durable power of attorney that rendered the guardianship unnecessary.  We reject P.G.'s arguments and affirm.

## BACKGROUND

¶2    In May 2019, an inebriated P.G., then age sixty-five, called police to report that "there were people on his property building pyramids and damaging his garage."  He was evaluated by social workers, who noted bruising throughout his upper body and deemed him a danger to himself.  A medical condition required P.G. to be hospitalized, at which time he experienced withdrawal and was diagnosed with "severely altered mental status and major neurocognitive disorder secondary to longstanding chronic alcoholism with suicidal ideation and erratic behavior."  In late May, he was released to the Winnebago Mental Health Facility, and in June he was transferred to Florence Health Services, a nursing home.

¶3    Contemporaneous with P.G.'s transfer to Florence Health Services, Florence County petitioned the circuit court to establish permanent guardianships of P.G.'s person and estate, as well as his protective placement.  A guardian ad litem (GAL) was appointed for P.G.  While at the Winnebago Mental Health Facility, P.G. was examined by a physician who noted P.G. had been suffering from memory issues for some time and had been unable to manage his finances or daily needs.  The physician observed that P.G. had been abusing alcohol, suffered

2

from bipolar disorder, and had other medical and cardiac issues. He concluded P.G. was suffering from severe dementia, severe cognitive impairment, and "gross impairment of insight and judgment." The physician determined that due to P.G.'s impairments, he was eligible for guardianship and protective placement.

¶4      The GAL, concerned that P.G.'s "presentation" during her in-person session with him did not match the physician's description of P.G., recommended an independent medical evaluation. Based upon P.G.'s objections to the petitions, the GAL also requested that adversary counsel be appointed for P.G. The circuit court granted both requests. Following a subsequent examination, psychologist Michael Galli diagnosed P.G. with severe alcohol-related dementia, bipolar disorder, and severe neurocognitive disorder. Galli concluded P.G. had moderate to severe impairment in most areas of functioning, including in his memory, reasoning and executive functioning. Galli further concluded that no less-restrictive alternatives were appropriate and that P.G.'s limitations "are so severe that he requires the services of a guardian." Galli also recommended protective placement in a secure setting with twenty-four-hour supervision.

¶5      The case proceeded to an evidentiary hearing in September 2019, at which P.G., his daughter R.B., and Galli testified, amongst others.[1] Following the evidentiary portion of the hearing, the GAL acknowledged struggling with her recommendation because P.G. "presents really pretty well, very articulate." The GAL was ultimately persuaded by Galli's medical opinion that the guardianships were in P.G.'s best interests. She stated she did not believe P.G. required nursing home placement and that the least restrictive environment consistent with his

---

[1] The Honorable Thomas Cane presided over the evidentiary hearing.

needs was "likely [twenty-four-hour] in-home services." She acknowledged, however, that type of placement might not be available in the region and that P.G. might need to be placed in a more restrictive setting.

¶6      The circuit court orally granted the petitions at the conclusion of the hearing. It was persuaded by the testimony regarding the "condition that [R.B.] found her father in when he was on his own," which "demonstrated the fact that he could not take care of himself."[2] The court acknowledged P.G.'s case was "unusual," but it stated that it did not have "any problem" with ordering guardianships and that "the requirements have been met" for both the guardianships of the person and of the estate. Indeed, the court stated its most difficult decision was "not the guardianship[s], it [was] the placement."

¶7      Regarding placement, the social worker who testified at the evidentiary hearing stated P.G. was in need of twenty-four-hour supervision. Although she recommended returning P.G. to the Florence nursing home, she stated that facility was unavailable to P.G. due to his failure to pay a bill. She ultimately recommended a residential facility in Clark County. On cross-examination by the GAL, the social worker acknowledged that a nursing home would be an "over placement" for P.G. and that he "could probably be provided services in a lesser restrictive facility." She testified, however, that "we

---

[2] R.B. had testified, among other things, that given P.G.'s medical conditions, he was a danger to himself if he was not taking his medications, which R.B. had been getting filled for him. She testified that P.G. had not done much on his own beyond brushing his teeth, taking a shower, and going to the bathroom, adding: "I have been in the house, and the toilets are disgusting. The mattress is soaking with urine. He has been sleeping on a shower curtain that I found. The carpeting was saturated with urine in the bedroom." She acknowledged he could do some basic care but stated that, after P.G.'s wife commenced divorce proceedings, he barely cooked food and had allowed garbage to pile up in his house. She further testified that P.G. had never taken care of the family financial affairs and was incapable of doing so now.

don't have those kinds of facilities in our area." When considering placement, the circuit court remarked that Clark County "may not be the right place for you," but the "reality is that there is just no other place at this time." The court determined that the Clark County facility was the least restrictive facility "at this time," and it emphasized that it expected the family and social workers to attempt to find a more suitable placement.

¶8      Following the hearing, the circuit court entered a form guardianship order determining that P.G. is incompetent due to a degenerative brain disorder. The form order had all necessary boxes checked to indicate the court was ordering guardianships of the person and of the estate. The form itself explicitly included the required finding that "the individual's need for assistance in decision-making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, or other means that the individual will accept." *See generally* WIS. STAT. § 54.10(3)(a)4. (2019-20).[3] However, there was no box to check, nor any check mark, next to that finding.

¶9      Pursuant to the circuit court's incompetency determination and guardianship order, the court issued letters of the guardianship of the person and of the estate for P.G. The court also entered an order finding protective placement was necessary and requesting that the County and P.G.'s family collaborate to find "a less restrictive place for the ward," with the placement to be reviewed in six months' time. P.G. now appeals.

---

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

**DISCUSSION**

¶10 We review a circuit court's decisions to order guardianship and protective placement using a mixed standard of review. We will not overturn a circuit court's factual findings unless they are clearly erroneous. *Coston v. Joseph P.*, 222 Wis. 2d 1, 22, 586 N.W.2d 52 (Ct. App. 1998); *see also* WIS. STAT. § 805.17(2). Whether the evidence satisfies the legal standards set forth in the relevant statutes is a question of law, which we review de novo. *Coston*, 222 Wis. 2d at 23. To the extent the circuit court's decision rests on the determination of the ward's best interests, that determination is reviewed for an erroneous exercise of discretion. *Anna S. v. Diana M.*, 2004 WI App 45, ¶7, 270 Wis. 2d 411, 678 N.W.2d 285.

*I. Validity of the Guardianship Orders Under WIS. STAT. § 54.10(3)(a)4.*

¶11 P.G. first argues the circuit court failed to make the required finding under WIS. STAT. § 54.10(3)(a)4. when ordering guardianships of the person and of the estate. Specifically, subsec. (3)(a)4. requires the court to find, by clear and convincing evidence, that

> [t]he individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement under ch. 52, or other means that the individual will accept.

The phrase "less restrictively" appears to broadly refer to the effect of a guardianship in circumscribing the ward's personal liberty and exercise of rights.

6

*See* WIS. STAT. § 54.01(18); *see also **Mills v. Neubert***, 250 Wis. 401, 404-05, 27 N.W.2d 375 (1947).[4]

¶12    P.G. essentially argues the guardianships were unnecessary because he was able to communicate effectively and the County failed to demonstrate that he had refused any services the County offered.  P.G. highlights certain testimony that he was generally cooperative with people who attempted to provide him with services and information.  P.G. argues that, under these circumstances, it was necessary for the County to present evidence "that services had been offered but rejected by P.G."  He further argues that because the guardianship orders were invalid, the protective placement order was also invalid.  *See* WIS. STAT. § 55.08(1)(b) (requiring a prior determination of incompetency for protective placement).

¶13    Consistent with P.G.'s argument, we assume without deciding that the phrase "less restrictively" under WIS. STAT. § 54.10(3)(a)4. has the same or a similar meaning as the phrase "least restrictive" under WIS. STAT. § 54.01(18). We have previously treated the determination of whether a particular level of restrictiveness is necessary as a question of fact, which we review using the clearly erroneous standard.  *Cf. **Fond du Lac Cnty. v. J.G.S., Jr.***, 159 Wis. 2d 685, 687, 465 N.W.2d 227 (Ct. App. 1990) (applying clearly erroneous standard to a finding of the "least restrictive placement" under WIS. STAT. ch. 55).

---

[4] P.G. does not dispute that the other elements necessary to establish the guardianships were sufficiently established; namely, that he was of the proper age, impaired, and unable to effectively receive and evaluate information or to make and communicate decisions related to the essential requirements for his health and safety or the management of his property and affairs. *See* WIS. STAT. § 54.10(3)(a)1.-3.

¶14 P.G. argues that, in this instance, whether his needs could be met through less restrictive means than a guardianship should be regarded as a question of law. P.G. reaches this conclusion because, in his view, the circuit court "did *not* make the finding required under [WIS. STAT.] § 54.10(3)(a)4." Accordingly, P.G. contends the issue is whether the court applied the correct legal standard when it found him incompetent. Whether a circuit court applied the correct legal standard is a question of law that we review de novo. *Robin K. v. Lamanda M.*, 2006 WI 68, ¶12, 291 Wis. 2d 333, 718 N.W.2d 38.

¶15 We reject P.G.'s assertion that the circuit court failed to make the requisite finding under WIS. STAT. § 54.10(3)(a)4. The court specifically found at the conclusion of the evidentiary hearing that all requirements necessary for the guardianships had been established. As even P.G. acknowledges, the court's form order found the guardianships were necessary and included language identical to that found in subsec. (3)(a)4. P.G. compares the situation to that in *Darryl T.-H. v. Margaret H.*, 2000 WI 42, 234 Wis. 2d 606, 610 N.W.2d 475, in which our supreme court determined that remand was appropriate when the circuit court failed to consider all relevant statutory factors concerning the child's best interests in a termination of parental rights case. To the contrary, the circuit court here clearly made the necessary finding of ultimate fact on the required element.[5]

---

[5] P.G. fails to draw a distinction between a circuit court's findings of ultimate fact versus its findings of historical or basic fact. *See Universal Foundry Co. v. DILHR*, 82 Wis. 2d 479, 486, 263 N.W.2d 172 (1978). While the court here can perhaps be faulted for not setting forth a more detailed recitation of the historical or basic facts supporting its conclusion that P.G.'s needs could not be met by means less restrictive than the guardianships, it cannot be argued that the court failed to make that determination in the first instance.

¶16 As a result, we apply the "clearly erroneous" standard of review to the court's determination of this finding. Under that standard, we will affirm the circuit court's finding as long as the evidence would permit a reasonable person to make the same finding. *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530. Moreover, we search the record not for evidence opposing the court's decision, but for evidence supporting it. *Id.*

¶17 We conclude there was sufficient evidence presented at trial to support the circuit court's determination that P.G.'s needs could not be met effectively by less restrictive means than the guardianships. Both Dr. Galli and P.G.'s social worker specifically testified that P.G. required twenty-four-hour supervision. Galli opined in his report, which was introduced as an exhibit at the evidentiary hearing, that there were no less restrictive interventions that would eliminate the need for a guardianship, explaining that P.G.'s "limitations are so severe that he requires the services of a guardian."[6]

¶18 Galli elaborated at trial that P.G. did not resist accepting treatment and there were "a lot of services that he could get with help from others." But Galli testified that P.G. could not "recognize the need for them or organize them on his own." Indeed, there was evidence that P.G. insisted he did not need help, believed he could live independently, and did not understand his limitations.

¶19 Additionally, although P.G. faults the County for failing to provide services for him that could have obviated the need for guardianship, there was

---

[6] Alternatives to guardianship identified on the form included training, education, support services, assistive devices, advanced planning (e.g., powers of attorney, trust, etc.), or a representative payee. Galli determined that none of these alternatives were viable options for P.G.

testimony establishing that many of those services were not available to P.G. At the time of the hearing, P.G. was awaiting a determination on his eligibility for Medicaid. P.G.'s social worker testified that although Florence County did not provide services like home cleaning, meals and counseling, such programs might be available through the Aging Disability Resource Center. But because P.G. had not yet met the Center's eligibility requirements, those services were not available to him, making an in-home situation untenable.

¶20 In sum, the evidence was sufficient to support the circuit court's finding under WIS. STAT. § 54.10(3)(a)4. that P.G.'s needs could not be effectively met through less restrictive means.

## II. Validity of the Guardianship of the Estate Under WIS. STAT. § 54.46(1)(a)2.

¶21 Alternatively, P.G. argues that the circuit court should have dismissed the petition for a guardianship of the estate under WIS. STAT. § 54.46(1)(a)2. Dismissal is warranted under subd. 2. if "[a]dvance planning by the ward, as specified in s. 54.10(3)(c)3., renders guardianship unnecessary." WISCONSIN STAT. § 54.10(3)(c)3., in turn, requires a circuit court to consider, as part of the guardianship determination, "[w]hether the proposed ward has engaged in any advance planning for financial and health care decision making that would avoid guardianship, including by executing a durable power of attorney under ch. 244, a power of attorney for health care, … a trust, or a jointly held account."

¶22 P.G. executed a financial durable power of attorney in Michigan in 2003.[7] The appointed agents were P.G.'s wife and his daughter, but only P.G.'s wife signed the "acceptance of duties of agent" form at the end of the power of attorney. The circuit court revoked the financial durable power of attorney on the basis that it was "void due to divorce action filed between the principal and proposed agent." P.G. argues the divorce was no bar to P.G.'s wife acting as agent and, in any event, the power of attorney named P.G.'s daughter as an alternate agent.

¶23 We conclude that the financial durable power of attorney did not render the guardianship of the estate unnecessary.[8] As the GAL notes, the mere filing of the divorce petition terminated his wife's authority to act as his agent, regardless of whether the divorce was finalized. *See* WIS. STAT. § 244.10(2)(c). Because R.B. did not sign the acceptance, it is unclear whether there is an agent available to act for P.G. under the financial durable power of attorney. Moreover, R.B.'s testimony at the evidentiary hearing can be reasonably construed as an assertion that she did not want to act on P.G.'s behalf for both health and financial issues.

---

[7] P.G.'s financial durable power of attorney, as well as his durable power of attorney for health care, formed the basis for a pretrial motion to dismiss the guardianship and protective placement petitions. The circuit court denied that motion. On appeal, P.G. does not challenge the court's determination that the durable power of attorney for health care did not render a guardianship of the person unnecessary because it did not permit the health care agent to admit P.G. to a nursing home or community-based residential facility. As part of the guardianship and placement proceedings, the court ordered the revocation of the durable powers of attorney P.G. had granted.

[8] No case law exists articulating what the standard of review should be for a circuit court's determination under WIS. STAT. § 54.46(1)(a)2. that advance planning does not render the guardianship unnecessary. Although we believe the matter is best reviewed as either a factual finding or discretionary determination, in this case it makes no difference which standard of review we apply, as we reject P.G.'s argument under even a de novo standard of review.

¶24 P.G. cites no evidence that R.B. was willing to accept the responsibilities of an agent in his wife's stead. Rather, P.G. notes that the financial durable power of attorney permitted an agent to appoint another person as a substitute agent to succeed him or her. It is not clear that this provision solves the problem, though, as the plain language of the power of attorney presumes that there exists a valid agent to appoint a substitute or successor. Again, neither P.G.'s wife nor his daughter appear to have an agency relationship with P.G. at this juncture.

¶25 In any event, the explicit terms of the financial durable power of attorney show that it did not make the guardianship of the estate unnecessary. Unlike the guardianship, it was "subject to revocation by [P.G.] at anytime" upon written notice to the agent. Moreover, the document contemplated that P.G. would have some continuing authority over his financial affairs, as it stated that "[a]ny disagreement between my Agent and myself does not constitute a revocation." Finally, the document provided that any "subsequent disability, incapacity or incompetency of the principal" would have no effect on the power of attorney—including, presumably, P.G.'s authority to revoke it. Under these circumstances, dismissal of the guardianship of the estate petition was not warranted under WIS. STAT. § 54.46(1)(a)2.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.